c

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| THADDYEUS AARON DIXON, SR., *ET AL.*, Plaintiffs | CIVIL ACTION NO. 1:18-CV-00133 |
| VERSUS | JUDGE DRELL |
| KEATON A. SPURLIN, *ET AL.*, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## MEMORANDUM ORDER

Before the Court are:  (1) Plaintiffs'[1] Motion to Compel and Alternative Motion for Leave to Propound Ten Additional Interrogatories Upon FCA, U.S., L.L.C. ("FCA") ("Motion to Compel or Propound Additional Interrogatories") (ECF No. 131); and (2) Plaintiffs' Motion to Compel FCA's Responses to Plaintiffs' Written Discovery Requests ("Motion to Compel Responses") (ECF No. 133).  FCA opposes both motions. ECF Nos. 140, 141.

## I.    Background

Plaintiffs propounded their Fifth Set of Interrogatories to FCA.  ECF Nos. 131-1 at 1, 140 at 5.  FCA formally responded, refusing to answer Interrogatory Nos. 50-59.  ECF Nos. 131-1 at 1, 131-2.   FCA claims Plaintiffs exceeded the number of allowable interrogatories.  FCA also objects on the bases of relevance, proportionality, and scope.  ECF Nos. 131-1 at 1, 131-2, 140 at 4.

---

[1]  Plaintiffs are Thaddyeus Aaron Dixon, Sr. and Alfra Dixon, individually and on behalf of their minor children, Ava Dixon, Rayna Dixon, and Farrah Dixon.

Plaintiffs seek to compel FCA to answer the ten interrogatories (Nos. 50-59) and seek costs and attorney's fees under Fed. R. Civ. P. 37(a)(5)(A).  ECF No. 131 at 1.  Alternatively, Plaintiffs seek leave to propound ten additional interrogatories to FCA under Fed. R. Civ. P. 33(a)(1).  *Id.*

FCA argues Plaintiffs have already propounded four sets of interrogatories containing a combined 40 individually numbered interrogatories.  ECF No. 140 at 4.  FCA asserts that, including "discrete subparts," Plaintiffs' have propounded 151 interrogatories.  *Id.* at 5.  FCA contends Plaintiffs propounded new discovery with each new shifting defect theory – most recently, a theory concerning "all vehicle seat belt system connection points."  *Id.*  FCA asserts that because Plaintiffs served all of their interrogatories jointly, each interrogatory is charged to all Plaintiffs.  *Id.* at 6.  And even so, Plaintiffs have still exceeded the limit if each were allotted 25 interrogatories, including "discrete subparts."  *Id.*  Overall, FCA argues its objections were substantially justified and asserted in good faith.  ECF No. 140 at 16.

Plaintiffs separately[2] seek to compel FCA to respond to written discovery requests seeking information and documents relative to vehicles that are "substantially similar" to the Plaintiffs' 2006 Chrysler Town & Country (RS) minivan manufactured by FCA's predecessor entities, specifically including, but not limited to, all AS, NS, RS, and RT Platform minivans.  ECF No. 133-1 at 1.  Plaintiffs contend their discovery requests are narrowly tailored to the alleged defect: front seats that

---

[2] Plaintiffs assert that the legal considerations and issues are distinct concerning FCA's refusal to produce documents, testing, and information related to vehicles the Dixons contend are substantially similar.  ECF No. 131-1 at 1, n.1.

deform or yield, and as a result, intrude into the cabin survival space of rear-seated occupants, in rear-end impact collisions. *Id.* at 8-10.   Plaintiffs asserts FCA has agreed to produce responsive documents for the RS platform minivans (2001-2007) with low-back front seating structure. *Id.* at 10-11.   Plaintiffs seek to compel responses as to AS, NS, or RT minivan platforms, and RS platform high-back seat structures.  *Id.* at 11. Plaintiffs seek costs and attorney's fees under Fed. R. Civ. P. 37(a)(5)(A).  ECF No. 133 at 1.

FCA opposes.  ECF No. 141.  FCA argues Plaintiffs seek production regarding vehicles very different from the subject RT platform minivan with seats very different from the seating system at issue. *Id.* at 5.  FCA refutes Plaintiffs' presumption that vehicles are "substantially similar" to the subject vehicle if the seats in those vehicles might yield in a rear end accident of sufficient severity. *Id.*  After conferral, FCA agreed to produce All-Belts-to-Seats ("ABTS"), a design utilized in certain Chrysler Sebring and Dodge Ram vehicles.  *Id.* at 5-7.  FCA contends that Plaintiffs' requests otherwise encompass almost every vehicle ever made by any manufacturer.  *Id.* at 6.

## II.   Law and Analysis

### A.   The motions to compel are principally governed by Rules 26 and 37.

Rule 26(b)(1) of the Federal Rules of Civil Procedure states:

Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within

this scope of discovery need not be admissible in evidence to be discoverable.

A court must limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

If a party fails to respond fully to discovery requests in the time allowed by the Federal Rules of Civil Procedure, the party seeking discovery may move to compel responses and for appropriate sanctions under Rule 37. An "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond." Fed. R. Civ. P. 37(a)(4).

B.   **Plaintiffs are entitled to 25 interrogatories each, and even including discrete subparts, Plaintiffs have not propounded excessive interrogatories.**

Rule 33 of the Federal Rules of Civil Procedure provides for the service of written interrogatories. Unless otherwise stipulated or ordered by a court, a party may propound "no more than 25 written interrogatories, including all discrete subparts," relating to "any matter that may be inquired into under Rule 26(b)." Fed. R. Civ. P. 33(a)(1)-(2). Leave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2). Fed. R. Civ. P. 33(a)(1).

"Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). A responding

party must state any objections with specificity.  Fed. R. Civ. P. 33(b)(4).  And a propounding party may move for an order compelling a response if a responding party fails to adequately answer an interrogatory submitted under Rule 33.  Fed. R. Civ. P. 37(a)(3)(B)(iii).

Where a party seeks leave to serve more than 25 interrogatories, leave "may be granted to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 33(a)(1); *Manship*, 232 F.R.D. at 559.  Rule 26(b)(1) provides that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). Rule 26(b)(2) instructs that discovery should be limited when:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(c). The numerical limit on interrogatories is intended to protect against the potentially excessive use of interrogatories, but not to prevent necessary discovery. *Estate of Manship v. United States*, 232 F.R.D. 552, 554 n.1 (M.D. La. 2005).

Plaintiffs propounded five sets of interrogatories, with numbers 50-59 at issue. ECF Nos. 140-2, 140-3, 140-4, 140-5, 140-8.   FCA responded to Plaintiffs' Interrogatory Nos. 50-59 with the following objection:

>FCA US objects to this interrogatory because it exceeds the number of interrogatories allowable under Federal Rule of Civil Procedure ("FRCP") 33(a)(1), and Plaintiffs have not obtained leave of court to exceed the proscribed limit. FCA US also objects to this interrogatory to the extent it seeks discovery of information not relevant or proportional to the needs of the case. FCA US further objects to this interrogatory to the extent it seeks information not in the possession, custody, or control of FCA US.

ECF No. 140-12 at 1-4.  Plaintiffs seek to compel FCA's responses to Interrogatory Nos. 50-59.  Alternatively, Plaintiffs seek leave to propound the ten additional interrogatories (Nos. 50-59).  ECF No. 131-1 at 1.  The parties dispute whether Interrogatory Nos. 50-59 are excessive, "relevant," proportional, and allowable in scope.

First, FCA contends Plaintiffs jointly should be limited to 25 total interrogatories because they elected to serve them jointly.  *Id.* at 6 (citing *Martin K. Eby Const. Co. v. OneBeacon Ins. Co.*, 2012 WL 1080801, at *2 (D. Kan. Mar. 29, 2012); *In re Independent Energy Holdings Secs. Litig.*, 2003 WL 42010 (S.D.N.Y. 2003)).  Plaintiffs contend they are five separate, living parties – and six taking Thaddyeus, Jr.'s survival claims into account – with separate claims and divisible interests in the lawsuit.  ECF No. 142 at 2.  Plaintiffs assert they are entitled to 25 interrogatories each.  *Id.*  Plaintiffs contend that, while *Martin* and *Independent Energy Holdings* offer guidance, each court ordered the objecting party to answer the additional interrogatories.  *Id.*

The parties cite no controlling authority limiting Plaintiffs collectively to 25 interrogatories total.  And the undersigned found none.  However, in *Independent Energy Holdings*, the court permitted multiple defendants to propound 25

interrogatories each – even if joint or aligned parties were presumptively entitled to only 25 interrogatories between them – given the complexity of the case, the propriety of the interrogatories, and the absence of undue burden on the responding party. *Independent Energy Holdings*, 2003 WL 42010, at *1.

Here, Plaintiffs served five sets of interrogatories.  Under the plain language of Rule 33(a), each Plaintiff is entitled to propound upon FCA 25 interrogatories, including all discrete subparts, without leave of court.  Fed. R. Civ. P. 33(a).  There is no indication Plaintiffs collectively agreed to limit themselves to 25 total interrogatories.  Rule 33 should be given a broad, liberal construction in order to provide the parties with the fullest possible knowledge of the facts and to clarify and narrow the issues.  *Bell v. Swift & Co.*, 283 F.2d 407 (5th Cir. 1960); *see also Hebert v. Lando*, 441 U.S. 153, 177 (1979).  Thus, FCA's objection is overruled in this respect.

Alternatively, FCA argues that Plaintiffs' interrogatories contain "discrete subparts" that well exceed the allowed number for each Plaintiff.  ECF No. 140 at 6.[3] FCA further asserts that it has produced over 20,000 documents[4] and engaged in informal discovery to address Plaintiffs' counsel's grievances, follow-ups, and additional questions.  *Id.*  at 5.

---

[3] Plaintiffs' contend that, including Thaddyeus Jr.'s survival claims, they would be allowed collectively 150 interrogatories.  ECF No. 142 at 2, n.5.

[4] *See also* ECF No. 131-1 at 3 (Plaintiffs state FCA has produced in excess of 20,000 pages of documents and that they are awaiting additional documents FCA has agreed to produce. Plaintiffs also argue their fifth set of interrogatories primarily seek explanation relating to six documents or about certain individuals.).

FCA argues that Plaintiffs propounded 151 interrogatories in their First through Fourth Sets of Interrogatories (ECF Nos. 140-2, 140-3, 140-4, 140-5), before serving their Fifth Set of Interrogatories. ECF No. 140 at 13-14. Plaintiffs do not refute this analysis line by line. ECF No. 142 at 4-5. However, Plaintiffs generally dispute that the interrogatories contain countable discrete subparts, or that the interrogatories actually total 151. ECF No. 142 at 4-5. Plaintiffs contend that many of the interrogatories do not contain discrete subparts, but instead, contain permissible questions subsumed by a primary question. *Id.* at 4.

Plaintiffs assert that due to the nature of the claims and the required amendments, FCA did not provide substantive responses to Interrogatories Nos. 1, 3, 6, 10, 11, 14, or 18. ECF No. 142 at 5. Additionally, Plaintiffs refer to an agreement with FCA's former counsel that Plaintiffs would propound additional interrogatories seeking information relative to specific product defects in lieu of FCA supplementing its original responses to Plaintiffs' First Set of Interrogatories. *Id.* at 5. FCA's current counsel admitted he was loosely aware of that agreement, but did not have the benefit of the details of that agreement.

Rule 33(a) does not define "discrete subparts," but the Advisory Committee states that "a question asking about communications of a particular type should be treated as a single interrogatory even though it requests the time, place, persons present, and contents be stated separate for each such communication." Fed. R. Civ. P. 33(a), Advisory Committee Notes to 1993 Amendment. In determining whether subparts should be considered separate interrogatories, courts consider "whether the

interrogatory subparts are 'logically or factually subsumed within and necessarily related to the primary [interrogatory] question.'" *Manship*, 232 F.R.D. at 554 (quoting *Dang v. Cross*, 2002 WL 432197 at *3 (C.D. Cal. Mar. 18, 2002)) (alteration in original)).  In other words, a court should determine "whether the first question is primary and subsequent questions are secondary to the primary question." *Id.* at 554.

In this case, the parties do not dispute that Interrogatories 4, 7-8, 15-17, 20, 24-25, 30, 34-35, 36-38, 40-41, and 49 (a total of 18 interrogatories) do not include "discrete subparts."  ECF Nos. 141-1 at 1-9, 142 at 4.  Upon careful review, Interrogatory Nos. 1-49 (ECF Nos. 140-2, 140-3, 140-4, 140-5) contain subparts that are secondary to, and subsumed by, principal questions.  Parallel document requests do not change this conclusion.  For the sake of clarity and procedural propriety, Plaintiffs should have separated these requests from coordinate interrogatories, and should have referenced those interrogatories in the requests.  But counting subparts seeking documents related to a primary question – even if technically appropriate – would elevate form over substance here.  The ends of justice are better served if FCA is required to treat any such subpart as a request for production.

Still, some of Plaintiffs' interrogatories contain discrete subparts:

- Interrogatory No. 1 (ECF No. 140-2 at 7) seeks information relating to each FCA response to a request for admission other than an "unqualified admission."  ECF Nos. 140-2 at 3-7.  In 12 responses, FCA did not offer an "unqualified admission."  So, Interrogatory No. 1 ultimately

9

constitutes 12 distinct requests.  (ECF No. 140-9 at 2-8).  However, the subparts of Interrogatory No. 1 are not discrete subparts because they seek subsumed details regarding each denial or qualification.

- Interrogatory No. 5 (ECF No. 140-2 at 8-9) consists of four "discrete subparts." However, Plaintiffs' inquiry regarding documents and the nature and location of the documents is not discrete, and should be treated as a request for production.

- Interrogatory No. 14 (ECF No. 140-2 at 11) consists of four "discrete subparts" because it seeks details of the design and manufacture of four distinct aspects of the subject vehicle.

- Interrogatory No. 19 (ECF No. 140-2 at 13) consists of two "discrete subparts," as communications with Plaintiffs and communications with Plaintiffs' physicians are distinct questions.

- Interrogatory No. 22 (ECF No. 140-2 at 14) consists of two "discrete subparts."  An inquiry about independent contractors is not necessarily subsumed within an inquiry about FCA and related entities.

- Interrogatory No. 23 (ECF No. 140-2 at 14) consists of three discrete subparts: the procedures followed in design and manufacture, questions concerning the design of the subject vehicle and subparts related to that design or design options, and design changes or remedial measures incorporated since 2006.

- Interrogatory No. 29 (ECF No. 140-3 at 6-7) consists of two discrete subparts.   Communications pertaining to seat system failures are distinct from communications pertaining to roof collapse.

- Interrogatory No. 33 (ECF No. 140-3 at 8-9) consists of three discrete subparts.   Vehicle roll-over, vehicle rear-end collision, and the use of child safety restraint seats in the middle row seats are independent considerations.

- Interrogatory No. 39 (ECF No. 140-3 at 10-11) consists of two discrete subparts.

- Interrogatory No. 47 (ECF No. 140-5 at 6) consists of five discrete subparts for each inquiry into each separate affirmative defense pleaded.

Thus, Plaintiffs have collectively propounded 78 interrogatories (Nos. 1-49), including "discrete subparts."  Plaintiffs did not exceed their limit before propounding the fifth set of interrogatories.  Leave was not required.   Even had it been, leave is appropriate.  The interrogatories are extensive, but do not impose an undue burden upon FCA.  This case involves the death of a child and the technical details of a complex vehicle design.   The nature and gravity of the case warrants extensive discovery.  Plaintiffs' questions do not exceed (in number) permissible boundaries.

## C.   FCA's objections are without merit.

Plaintiffs also claim that FCA asserts "boilerplate objections," which the Fifth Circuit disfavors.   ECF No. 131-1 at 3.   Plaintiffs contend their fifth set of

interrogatories seeks information related to six documents already produced by FCA. *Id.* at 4.   According to Plaintiffs, the information sought is highly relevant and proportional to the needs of the case.  *Id.* at 5.

For example, Plaintiffs contend Interrogatory Nos. 56 and 59 (labeled 58 in error) seek information and clarification regarding a document numbered FCAUS 18962, and titled "High Speed Rear Impact Performance Objectives."   *Id.* Interrogatory Nos. 57 and 58 seek information about FCAUS 18964, "High Speed Rear Impact Performance Objectives," the stated "goal" of which is to describe "protection for belted occupants and children based on 'real world' events."   *Id.* Plaintiffs maintain that FCA's objections to these interrogatories are unjustified, particularly in a case of this kind.  *Id.* at 5-6.

FCA objects to Plaintiffs' Fifth Set of Interrogatories (Nos. 50-59) based on relevance, proportionality, and scope (information or documents outside FCA's possession, custody, or control).  ECF No. 140-12 at 1-4.  FCA does not address its relevance and proportionality objections other than to state that Plaintiffs exceed the allowable limit.   *Id.*   To that extent, FCA's objections as to relevance and proportionality are invalid.

As to scope, FCA contends that while it has assumed responsibility for defending actions involving vehicles manufactured prior to FCA's existence, it is not a successor to the manufacturer of the subject vehicle. *Id.* FCA argues DaimlerChrysler Corporation ("DaimlerChrysler") used outside supplier Magna Seating Systems of America, Inc. ("Magna") for the front seat systems assembled into

the 2006 Chrysler Town & Country (RS) minivan.  *Id.* at 15.  FCA further contends the supplier of the driver and passenger belt systems in the 2006 Chrysler Town and Country (RS) minivan was Key Safety Restraint Systems ("Key Safety"), now known as Joyson Safety Systems.  *Id.*  Supplier documents are not maintained by FCA, nor were they maintained by DaimlerChrysler in the ordinary course of business.  *Id.* Magna and DaimlerChrysler were never "affiliates" and FCA did not exist when the vehicle was designed, manufactured, and sold.  *Id.*  FCA argues Plaintiffs fail to show FCA has the legal right or the practical ability to obtain documents from a non-party. *Id.*  FCA further argues Plaintiffs have subpoenaed both Magna and Key Safety, and both responded to the subpoenas.  *Id.*

Plaintiffs contend FCA never states it cannot provide the information or that it does not have the "practical ability" to obtain information or documents from Magna or Key Safety. ECF No. 142 at 7.  Plaintiffs also note FCA never describes or argues that any response would be unduly burdensome or difficult.  *Id.*

Rule 34 requires that a responding party produce responsive documents that are within a party's "possession, custody, or control."  Documents are deemed to be within the "possession, custody or control" of a responding party if that party either has "actual possession, custody or control" of the documents or if that party "has the legal right to obtain the documents on demand or has the practical ability to obtain the documents from a non-party to the action." *Estate of Monroe v. Bottle Rock Power Corp.,* No. 03–2682, 2004 WL 737463, at * 10 (E.D. La. April 2, 2004). "Rule 34 is broadly construed and documents within a party's control are subject to discovery,

even if owned by a nonparty." *Id.* (citing *Commerce and Industry Ins. Co. v. Grinnell Corp.,* Nos. 97–0775, 97–0803, 98–2200, 2001 WL 96337, at *3 (E.D.La. Feb. 1.2001)).[5]

To the extent FCA fails to state their objections with specificity, FCA's objections are overruled. *See* Fed. R. Civ. P. 33(a)(b)(3)-(4). Any officer or agent of a public or private corporation, partnership, or association must furnish the information available to the party. Fed. R. Civ. P. 33(b)(1)(B). Rule 26(g) requires "a reasonable inquiry" when responding to discovery requests. Therefore,

> [t]he answering party cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control. The answering party is required to give information available to him, including information available to his agents or

---

[5] In addressing a business's control over documents of a nonparty, the United States District Court for the Middle District of Louisiana has stated:

> The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought. *Id.* Typically, what must be shown to establish control over documents in the possession of a non-party is that there is "a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession." *Id.; see also Shell Global Solutions (US) Inc. v. RMS Engineering, Inc.,* No. 09–cv–3778, 2011 WL 3418396 (S.D.Tex. Aug. 3, 2011) ("Among the factors used by courts to determine whether one corporation may be deemed under control of another corporation are: (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement of the nonparty corporation in the transaction, and (e) involvement of the non-party corporation in the litigation."). Courts have ordered corporate parties to produce documents in the possession of corporate relatives—such as parent, sibling, or subsidiary corporations. *See Steel Software Sys. Corp. v. DataQuick Info. Sys., Inc.,* 237 F.R.D. 561, 564 (D.Md.2006).

S. Filter Media, LLC v. Halter, CIV.A. 13-116-JJB-RL, 2014 WL 4278788, at *5 (M.D. La. Aug. 29, 2014). However, as discussed herein, the subject interrogatories request information related to documents already in the possession of FCA.

14

representatives whether personally known to the answering party or not. If the answering party lacks necessary information to make a full, fair and specific answer to an interrogatory, it should so state under oath and should set forth in detail the efforts made to obtain the information.

*In re Katrina Canal Breaches Consol. Litig.*, CIV A 05-4182, 2007 WL 1959192, at *1 (E.D. La. June 27, 2007) (citations omitted). In responding to discovery requests, a party is "charged with knowledge of what its agents know or what is in records available to it." *Monroe's Estate v. Bottle Rock Power Corp.*, 2004 WL 737463, at *10 (E.D. La. 2004).

Here, it seems evident that FCA is in possession of the documents that are the subject of Interrogatory Nos. 50-54 and Interrogatory Nos. 56-59.   Plaintiffs specifically refer to the FCA bates stamp numbers in referencing the previously produced documents.  *See* ECF No. 131-2 at 2-6.  FCA also disclosed in briefing information as to the nonparty suppliers who produced the documents that are the subject of the inquiries.  ECF No. 140 at 14-15.  To the extent FCA is in possession of the requested information and the information is "available" to FCA, FCA's objection is overruled.

Considering the alleged significance of the requested information, FCA must provide supplemental verified written responses to Plaintiffs' Fifth Set of Interrogatories with the requested information in its possession, custody, or control, or practically available to it.  If FCA does not have any additional information responsive to Plaintiffs' requests, FCA must clearly state in its verified responses that, upon reasonable inquiry, it does not have the requested information in its possession, custody, or control, or that the requested information is not available to

15

it.   In responding, FCA must observe the standards set forth above regarding documents or information which it may practically obtain.

>   **D.**   <u>Plaintiffs' Motion to Compel (ECF No. 133) FCA's responses is granted in part to the extent Plaintiffs seek information and documents relating to RS platforms FCA agreed to provide after the filing of this motion.</u>

Plaintiffs separately seek to compel complete responses to Plaintiffs' written discovery requests[6] for information and documents relative to vehicles that are "substantially similar" to the Plaintiffs' 2006 Chrysler Town & Country, including, but not limited to, all AS, NS, RS, and RT platform minivans.[7]  ECF No. 133-1 at 1. Plaintiffs note that an individual ruling as to each individual request is not necessary. ECF No. 131-1 at 14 n.23.  Instead, Plaintiffs state (and Defendants agree) that a ruling as to the scope of discovery – here, discovery relating to other models of FCA vehicles – would resolve the substance of the parties' dispute.  *Id.*

Fed. R. Civ. P. 26(b)(1) describes the general scope of discovery: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

---

[6] Plaintiffs reference FCA's Responses to Plaintiffs' Second Set of Requests for Admissions, Interrogatories, and Requests for Production of Documents (pertinent portions) at Interrogatory Nos. 27, 36-39 and Requests for Production of Documents Nos. 22-25, 27-28, FCA's Responses to Plaintiffs' Third Set of Requests for Production (pertinent portions) at Requests for Production No. 37, FCA's Responses and Objections to Plaintiffs' Fourth Set of Requests for Admission and Request for Production of Documents (pertinent portions) at Request for Admission Nos. 19-20 and Requests for Production Nos. 39-42, and FCA's Responses and Objections to Plaintiffs' Fifth Set of Interrogatories and Sixth Set of Requests for Production of Documents (pertinent portions) at Requests for Production Nos. 57, 59-69, and 71.  *See* ECF No. 133-1 at 7 n.4; *see also* 133-2, 133-3, 133-4, and 133-5.

[7] Plaintiffs assert that, in addition to the RS platform (2001-2007), FCA minivan platforms include the AS Platform (1990-1995), NS Platform (1995-2000), and RT Platform (2008-2020).  ECF No. 131-1 at 15.

To find the boundaries of discovery, a court must consider two issues: relevance and proportionality.   And the two issues must be considered in tandem, as "[a]ny information sought that is not relevant to a party's claim or defense is not discoverable, regardless of proportionality." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, No. CV 13-373-SDD-EWD, 2018 WL 276941, at *4 (M.D. La. Jan. 3, 2018).

A court should weigh the need for broad disclosure to both sides to litigation. But a court should also consider the obverse need to set reasonable boundaries for discovery given factors such as burden, expense, and inefficiency.  *See,* e.g.*, Evans v. Thomas*, No. 6:19-CV-01485, 2020 WL 5876775, at *2 (W.D. La. Oct. 1, 2020) (and cases cited therein).   Moreover, while the moving party carries the burden of establishing that information sought in discovery is, in fact discoverable, the responding party may counter with a showing that, among other things, the information is irrelevant or disproportionate to the needs of the case.  *See Citco Grp. Ltd., No. CV 13-373-SDD-EWD, 2018 WL 276941, at *4.*

### 1.    Relevant evidence includes information about the allegedly defective seating design feature.

#### a.    Relevance concerns whether evidence affects the probability of a material fact.

The term "relevant" as used in Rule 26 can be elusive.  As such, excluding potential definitions and descriptors can be helpful.  First, and by way of reminder at this point, the term does not include evidence "reasonably calculated" to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26, 2015 amend. cmt.  The phrase was deemed problematical and overbroad, removed in 2015, and replaced with this

notably direct phrase: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Put simply, the standard is "discoverability," without reference to "admissibility" even contemplated in the future. The 2000 Note offers examples of information that "suitably focused, would be relevant to the parties' claims or defenses . . . [including] 'other incidents of the same type, or involving the same product.'" *Id.*

Second, information relevant to "the subject matter involved" is no longer an operative phrase. The reasons this phrase has been abandoned appear in the Commentary to the 2015 amendments to Rule 26:

> Proportional discovery relevant to any party's claim or defense suffices, given a proper understanding of what is relevant to a claim or defense. The distinction between matter relevant to a claim or defense and matter relevant to the subject matter was introduced in 2000. The 2000 Note offered three examples of information that, suitably focused, would be relevant to the parties' claims or defenses. The examples were "other incidents of the same type, or involving the same product"; "information about organizational arrangements or filing systems"; and "information that could be used to impeach a likely witness." Such discovery is not foreclosed by the amendments. Discovery that is relevant to the parties' claims or defenses may also support amendment of the pleadings to add a new claim or defense that affects the scope of discovery."

Fed. R. Civ. P. 26, amend. cmt. Additionally, Rule 26(b) should exclude some discernable body of evidence, and should prevent "fishing" and mere "speculation." *See N. v. Landstar Sys. Inc.*, No. 6:20-CV-00466, 2020 WL 5636902, at *1 (W.D. La. Sept. 21, 2020).

Excluded limitations aside, what *is* relevant still eludes us to this point. But in the aggregate, Rule 26, court decisions, and common-sense notions of fairness provide enough guidance. At the outset, relevant evidence must pertain to a claim or

a defense under Rule 26.  When a plaintiff seeks discovery then, a court may look to the substantive law underlying a plaintiff's claims to define relevance.  Only then can a court ask *how* pertinent disclosure of evidence may be, or how burdensome its production may be.  *See Citco Grp. Ltd., No. CV 13-373-SDD-EWD, 2018 WL 276941, at \*4* ("A determination of relevancy is tied to applicable substantive law and then weighed against the six proportionality factors.").

In addition, some courts simply look to evidentiary (not admissibility) rules for a definition of evidence.  *See, e.g., Davenport v. Hamilton, Brown & Babst, LLC*, No. CIV.A. 07-928-RETSCR, 2008 WL 5101998, at \*1 (M.D. La. Nov. 25, 2008).  Fed. R. Evid. 401 states that evidence is relevant if: ""Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

### b.   "Substantial similarity" is the proper standard.

Turning to substance, designs in other vehicles manufactured by FCA are relevant only if those designs may tend to prove or disprove a claim or defense. Plaintiffs maintain the discovery will relate most directly to their design defect claim. The Court agrees.  So the design claim will occupy our focus from here.

In substance, the design claim could require Plaintiffs to prove (1) the history, pattern, and prevalence of the defect; (2) whether there was an "alternative design for the product that was capable of preventing the client's damage," which in this case would involve seat design, and; (3) the relative burden to FCA having used that alternative design.  *See* La. R.S. 9:2800.56.

Plaintiffs argue that information concerning a "substantially similar" defect to the one Plaintiffs identify – even in a different seat system or vehicle – is relevant to the design claim.  Defendants do not directly challenge that standard.  And fairly consistent jurisprudence, in our circuit and others, applies "substantial similarity" to design claims.  *See Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1082 (5th Cir. 1986) ("Evidence of similar accidents occurring under substantially similar circumstances and involving substantially similar components may be probative of defective design.").  The Court therefore applies "substantial similarity" as an operative standard in this case.

### c.      Plaintiffs must identify substantially similar *defects*.

Further, the parties dispute what, exactly, must be "substantially similar" to what else.  Among other things, FCA references seats, seat systems, vehicles, and vehicle bodies, cabins, and compartments, all as points of distinction.  These distinctions may affect the weight and meaning of the evidence, and may, upon proof, effectively "nullify" the design defect as a limitation such that it cannot be tested in other models.

But as Plaintiffs point out, the rule in discovery is clear: to obtain discovery regarding a comparator, the *defect alleged* must be substantially similar to the *defect purportedly present* in the comparator: "The 'substantially similar' predicate for the proof of similar accidents is defined, again, by the defect (or, as we have also termed it, the product) at issue."  *See,* e.g*., Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 426 (5th Cir. 2006) (citing *Jackson*, 788 F.2d at 1082-83).

The parties also seem to disagree about what the disputed defect really *is* or *could be*.  Plaintiffs describe it as a designed tendency of the front row seat system to buckle or fold rearward into the middle row's survival space in a predictable rear-end collision. [8]  FCA takes issue in several ways, some of which Plaintiffs called, with arguable accuracy, an effort to "caricature" Plaintiffs' description.

As an example, FCA argues that all seats in all vehicles yield rearward by design.  At that level of generality, it is difficult to disagree.  Plaintiffs do not suggest that all vehicles with seats anywhere placed that are designed to yield rearward at some level of force are "substantially similar."  And those are not the parameters that would link Plaintiffs' minivan to the minivans in the requested discovery. [9]

FCA also argues that the differences at issue in this case are so significant that any comparison would not be useful in analyzing the defect alleged.  In fact, FCA and Paul Shea ("Shea") argue that the system on Plaintiffs' minivan was "unique" among

---

[8] Divided into its component parts, the defect alleged by Plaintiff could, in summary, be described as:
(1) the design tendency of the front seat system installed in Plaintiffs' 2006 Town & Country minivan to,
(2) fail or intentionally deform rearward and protrude into the survival space of middle-seat occupants,
(3) as a consequence of a rear-impact collisions, which collision,
(4) could be characterized as "predictable" or "foreseeable," meaning collisions at such speeds and of such types and severities that FCA should have expected them to occur regularly and to result in potentially avoidable injuries.
(5) as opposed to a collision which could be characterized as "extreme" or "unusual," meaning a collision at such speeds or of such type or severity that FCA should not have reasonably expected frequent collisions or avoidable injuries.

[9] FCA notes that Plaintiffs' expert has given extensive previous testimony in this field.  In particular, he has testified that, for decades, all front seats had been designed to yield rearward.  But Plaintiffs do not seek all vehicles' front seat specs.  And in this case, Dr. Saczalski has testified only to the substantial similarity between the yielding tendency in Plaintiffs' minivan and the same tendency in minivans in the 4 other requested lines.

the others identified.   However, FCA's argument initially strays too close to the "Catch-22" situation that so often arises in products liability cases.  Where one party controls an imbalance of the relevant data, the other party must often prove, for example, substantial similarity, which can only be done with that same data.  *See Albee v. Cont'l Tire N. Am., Inc., No. CIVS091145LKKEFB, 2010 WL 1729092, at \*7 (E.D. Cal. Apr. 27, 2010).*

The argument is also misplaced.  If Plaintiffs' seat design was truly unique, that does not mean the actual "defect" in that design was also unique, or that despite any differences, the designs suffer from the same defect and cause similar injuries upon failure.  If Plaintiffs' seat design was not unique, Plaintiffs may be interested in the evidence for converse reasons.  Either way, the comparator evidence may still be relevant to explore alternative designs.

Most importantly, Shea's affidavit does not support the argument.   Shea provided otherwise helpful detail regarding myriad other differences in seat design: aesthetics, support, cushions, restraint placement, post placement, and recliner functions, among others.   But Shea does not state that the alleged defect is incomparable among the different lines of minivans.  He does not state that Plaintiffs would be practically or scientifically prohibited from conducting meaningful discovery about the defect itself and its manifestation in other seat and minivan designs.  And he does not state, with clarity or support, that the minivan distinctions will irreparably change the defect across models.

> **d.  Plaintiff need not match, or overcome distinctions among, different models to obtain discovery.**

At core, the parties disagree about the differences in referenced minivans – differences other than designed front-seat yielding tendency.  The jurisprudence is less clear in this respect.  And the differences are more significant than others one could imagine, since the "products" in question are vehicles.  But in the end, the rule is relatively clear: If the defect is present in a comparator, and the defect affects a legal issue, almost any other distinctions in the comparator will not preclude discovery.

On one hand, courts rarely even consider whether products have shared, but "non-defect" characteristics.  On the other hand, courts routinely require discovery when designs or products *do share* the alleged defect, even if the designs or products are substantially different in other ways.  *Diaz v. Goodyear Tire & Rubber Co.*, No. CV 07-353-B-M2, 2008 WL 11351508, at *6 (M.D. La. Apr. 21, 2008).

In a seminal decision on this issue, the United States Court of Appeals for the Fifth Circuit made clear that discovery may, and should, go beyond the components involved in a liability case.  *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1080 (5th Cir. 1986).  The *Jackson* court considered an automotive rim base of one brand that was mismatched with a side ring of a different brand.  The side rings functioned well, but looked similar enough that they could be mismatched by appearance.  *See id.*  In deciding that other mismatched hardware was discoverable, the court found that "[t]he true proportions of a 'mismatch defect' can be assessed only in relation to the whole range of *potentially* mismatching components, not merely those that were *actually* mismatched in any particular case."  *Id.*

23

In another illustrative case, the defendant manufactured electrodialysis reversal ("EDR") systems used to reduce salt content in water. *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 422 (5th Cir. 2006). The plaintiff operated a water treatment plant and used an EDR system. *Id.* The defendants eventually retrofitted the EDR system with spacers. *Id.* Shortly thereafter, the EDR system began to fail, fires erupted at the plant, and the plaintiffs chose to close plant operations. *Id.* The Fifth Circuit held that evidence of fires at other facilities with EDR systems should not have been excluded at trial. *Id.* at 423.

The court rejected "non-defect" distinctions in reaching "substantial similarity" limits. According to the court, if the defect was present in otherwise "similar" comparators, those comparators are fertile ground for evidence, whether or not independent distinctions could be identified. *Id.* at 426. To that point, the defendant claimed that the subject fire was "unique" – a familiar term here – because other design features and circumstances could have caused the comparator fires. *See id.* The court disagreed:

> Although Ionics urges that the district court properly excluded evidence of other fires because the circumstances of the BRA fires were unique, the law in this circuit with respect to cases, such as this case or *Davidson,* that are not product liability cases, is that the degree of similarity is a question that goes to the weight of the evidence (for the jury), not to admissibility. As long as there are similarities (as there are here), the differences are for the jury to decide. Similarly here, the issue, which is whether possible unique circumstances of the BRA fire (*e.g.,* hot spots) made the BRA event distinguishable from other fires, goes to the weight of the evidence, not to admissibility.
> . . . .
> The mere fact that some but not all of the fires involved the rather unique MK III–4 retrofit spacers (or hot spots) does not mean that they are not relevant and therefore admissible under the factors outlined

24

above. BRA is arguing that the high voltage of the retrofit system—a consequence of the thinner membranes installed during the retrofit—together with the propensity of the shrink-wrap cable-bar assemblies and stack siding to ignite in high voltage environment—was a breach of the implied warranties of fitness for a particular purpose and merchantability. Because all the other fires appeared to involve at least two of these characteristics, they are "similar" to the occurrence at BRA; the jury is to decide the weight to be given to any distinguishing factors.

*Id.* at 426-27.

This case presents a similar alleged defect.  Like the propensity to be mismatched, or to contribute to fire-hazard conditions regardless of other contributors, Plaintiffs' alleged defect implicates other seat systems in other vehicles, but shares with those vehicles' designs an alleged yielding tendency in "foreseeable" rear-end collisions.  With a clearly "shared" alleged defect – there is no substantive dispute that the seats could have comparable yielding tendencies – any remaining differences would not affect the scope of discovery.  That is, unless those differences had been shown to ruin the comparator's evidentiary value in some respect.  No such showing has been made.

Again, there is a stilted evidentiary dispute.  But Plaintiffs have the better of it.  FCA's expert Shea testified about pertinent defect issues, but only in vague generalities, most often not even mentioning the defect, any particular vehicle, or how distinctions may specifically affect seat performance.  Instead, he testified that different vehicle characteristics "may affect the crash response," and thus, that vehicles with newer seat systems "may have . . . different seat performance in a crash."  ECF No. 141-1 at 4.

Intuitively, many would agree, and the statement may be objectively true.  But these statements alone cannot carry FCA's entire burden, particularly not when there is countervailing evidence on record.

Plaintiffs' expert, Dr. Saczalski, testified that the AS, NS, and RS platforms were substantially similar in terms of the design characteristic at issue – yielding tendency in the front seat system.  Dr. Saczalski stated that he has performed comparative analyses of these very lines and has also tested and compared results from strikingly different vehicles (a sedan and a truck).  These comparisons would necessarily have included some of the distinctions noted by Shea, such as the high-back and low-back seat design that distinguishes Plaintiffs' minivan from others.  Dr. Saczalski found at least some numerical similarity in measured test results.  His findings indicate that – among the AS, NS, and RS lines – results as to yield tendency, at the very least, can be comparable.

Dr. Saczalski attests that "[e]ach of the AS, NS, and RS Platform minivans . . . are substantially similar vehicles in the context of seat system deformation in rear-end impact collisions."  ECF No. 133-6 at 2.  He specifies that they are substantially similar because:

> (1) "the seat systems integrated into the AS, NS, and RS platform minivans . . . are designed to deform and yield rearward in foreseeable rear-end impact collisions and, in fact, deform and yield rearward";
>
> (2) he personally performed dynamic and static testing in controlled environments comparing weak AS, NS, and RS seat systems to strong, commercially available, belt-integrated seat systems . . . such as the Chrysler Sebring and Dodge Ram;

26

(3) he "quasi-statically tested the 2001 Chrysler RS Grand Caravan and Town & Country seats while running a series of 12 rear-impact sled-buck tests with a 3 year-old H-III anthropomorphic test device behind different sized adult front driver surrogates seated in both NS and RS platform seats [where] test results showed that the 18 to 25 mph Barrier Equivalent Impact Level of the 175 lb. adult male, whether seated in NS or RS Platform seats, caused a rear-seated 3 year-old H-III to experience high head and/or chest loads such that the test values exceeded NHTSA child reference levels"; and

(4) he determined, through his research and testing, that the seat systems integrated into each of the AS, NS, and RS Platform minivans deform and collapse rearward in rear-end impact collisions, leading to a substantial danger of loss of vehicle control, reduced effectiveness of seat-belt systems, front seat passenger ejection, and injury to rear-seated passengers. *Id.* at 2-3.   He attests that documents and information relative to the seat systems integrated into the AS, NS, and RS platform minivans will be instructive to the study of the deformation of the seat systems in the 2006 Town & Country RS platform minivan in a rear-end impact collision.

*Id.* at 3.

Dr. Saczalski does not opine about the RT model.  Shea, however, once again distinguishes the RT model based upon seat design and features.  But Shea also does not actually opine that the RT model seat systems would reflect incomparable yield tendency results if tested against Plaintiffs' model.  What is known and clear is that the RT line immediately followed the Dixons' RS line in production, included a minivan, and featured a different seat design.  Absent agreement between the parties, however, the years of production of the RT line would likely become decreasingly probative.  Seven years of records pertaining to the RT line (2008-2014) could fairly be considered relevant.

###### e.      Relevant factors suggest "proportionality."

"Relevant" evidence having been identified, the Court next considers whether Plaintiffs' requests are "proportional to the needs of the case." Fed. R. Civ. p. 26(b)(1). A number of factors may be considered, including: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P.

The parties and the Court have a collective responsibility to consider the proportionality of all discovery in resolving discovery disputes. *Id.*, Advisory Committee's Note to 2015 Amendment. "A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." *Id.*

Plaintiffs present Dr. Saczalski's affidavit in support of its assertion that the fatal characteristic – front seatbacks that yield rearward in a rear-end impact collision – also existed in a number of other FCA vehicles. ECF No. 131-1 at 9. Plaintiffs argue they must establish the knowledge and existence of an economically feasible alternative design to prevail on their Louisiana Products Liability Act claims.

*Id.* at 10.  Plaintiffs seek documents relative to FCA minivans or vehicles with the same specific defect alleged in the suit.  *Id.*

FCA admits its seat systems are designed to yield in rear-end impact collisions. ECF Nos. 131-1 at 9, 141 at 5, 10-11.  FCA agreed to produced responsive documents for the RS platform minivans (2001-2007).  ECF No. 131-1 at 11, 19.  FCA has produced all technical documents relating to the RS platform, which includes the seven model years and three vehicle families:  the Town & Country, the Voyager, and the Grand Voyager.  FCA has also agreed to produce documents regarding additional models concerning the All-Belts-to-Seats ("ABTS") design in certain Chrysler Sebring and Dodge Ram vehicles.  ECF No. 141 at 5 n.1.

However, FCA contends none of the AS, NS, or RT platforms (or any other vehicle) are "substantially similar" to the 2006 Town & Country RS platform.  ECF No. 133-9, 141.  FCA argues the scope of Plaintiffs' discovery, according to their expert, literally encompasses almost every vehicle ever made by any manufacturer. ECF No. 141 at 6.[10]  FCA contends that Plaintiffs allege the low back seat assembled in Plaintiffs' RS minivan was defective.  *Id.* at 6-7.  FCA asserts the Plaintiffs' RS minivan was part of the 2001-2007 RS platform.  *Id.* at 7.  FCA contends the RS platform includes two different front seat system designs: a low-back seat structure

---

[10] Plaintiffs' own expert has testified "it is common knowledge that in 1987 and 1988 all front seats in all automobiles from all manufacturers throughout the world were designed to yield and eventually collapse on significant rear impacts."  ECF No. 141 at 10 (citing *Gardner, By & Through Gardner v. Chrysler Corp.*, 1995 WL 708682, at *6 (D. Kan. Nov. 1, 1995)).  FCA also notes Dr. Saczalski's prior testimony admitting that there were two schools of thought on whether a more rigid seat back versus yielding seat backs provide a safer alternative design.  ECF No. 141 at 11 (citing *Finchum v. Ford Motor Co.*, 57 F.3d 526, 532 n.5 (7th Cir. 1995)).

with an adjustable head restraint and dual power recliners and a high-back seat structure with an integrated head restraint and single-sided recliner.  *Id.*

In support, FCA submits the affidavit of Shea, an engineer employed by FCA. ECF No. 141-1.  Shea attests that front seat systems installed in FCA's and prior Chrysler entity's vehicles, including AS, NS, and RT platform minivans, are not substantially similar to the low-back power front seat systems with dual recliners and adjustable head restraints assembled in the Plaintiffs' 2006 Chrysler Town & Country (RS) minivan.  *Id.* at 1.  Shea attests that vehicles that are not substantially similar in vehicle dimensions, properties, and with a substantially similar low-back front seat system to the Chrysler Town & Country (RS) can have a different crash response and different seat performance in a crash.  *Id.* at 3-4.  How the front seat system yields in a rear end collision may not be substantially similar in different vehicle platforms. *Id.* at 4.

Each relevant factor would support a finding that the discovery sought is proportional.  The first two factors remind the court and parties of the stakes at issue in the litigation.  This case involves catastrophic, and fatal, injuries, including the death of an infant child.  Significant damages and financial consequences are in play. As are important, large-scale business concerns – financial, reputational, and managerial.  Extensive discovery is warranted.

Next, FCA by default enjoys a significant imbalance of access and resources. As a large company with extensive assets, FCA's ability to continue litigating the case likely dwarfs Plaintiffs' resources as individuals.  Plaintiffs – like most litigants in

their position – must rely extensively upon Defendants to obtain lawful discovery and to exercise some control over timing. Moreover, to satisfy their burden of proof, Plaintiffs must seek documents from FCA and Defendants which can be found nowhere else.

The discovery sought is of vital importance. Some of the exchanged information may be linchpin evidence in a trier of fact's decision as to liability. And again, the information is relevant. The controlling characteristic is yield tendency. Other distinctions may be relevant, and could affect defect viability along with weight and admissibility. But other distinctions have not been shown to preclude discovery in this case.

Finally, any reasonable cost-benefit analysis would sanction this discovery. Counsel for Plaintiffs makes the perhaps rare, but undeniable point that FCA cannot be unfamiliar with, or unable to easily access, this discovery. Moreover, the information has been categorized and stored by FCA according to its preferences and in its physical and digital storage facilities. The production will no doubt be voluminous and, at times, painstaking. As noted below, cooperation will be vital, and thus, required. But given the potentially vital nature of some of this production (to both sides), future benefits will outweigh the costs.

No salient factor disfavors production.

### E. Plaintiffs' motions for expenses and attorney's fees relating to both Motions to Compel (ECF Nos. 131, 133) are DENIED.

Plaintiffs seek to recover reasonable expenses and attorney's fees incurred in the preparation and filing of both motions to compel (ECF Nos. 131, 133). A court

must award fees and costs if the motion is granted or if the requested discovery responses are provided after the motion is filed.  Fed. R. Civ. P. 37(a)(5)(A).  However, a court is not required to award fees and expenses if other circumstances make an award of expenses unjust.  Fed. R. Civ. P. 37(a)(5)(A)(iii).  FCA was substantially justified in its belief that Plaintiffs exceeded their limit of interrogatories.  Here, the Court finds that the parties shall each bear their own costs in connection with the motions as an award of fees and expenses under the present circumstances would be unjust.

III.   <u>Conclusion</u>

IT IS ORDERED that Plaintiffs' Motion to Compel (ECF No. 131) is GRANTED IN PART.

IT IS FURTHER ORDERED that FCA shall, not more than fourteen days after the date of this order, produce supplemental written responses to Plaintiffs' Fifth Set of Interrogatories, with verification, in accordance with this ruling.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Compel (ECF No. 133) is GRANTED IN PART to the extent Plaintiffs seek information and documents relating to all minivans in the AS, NS, RS, and RT (years 2008-2014) platforms.  FCA will respond in accordance with the provisions of this ruling on or before December 11, 2020.

IT IS FURTHER ORDERED that, in all other respects, Plaintiffs' Motion to Compel (ECF No. 133) is DENIED IN PART.

IT IS FURTHER ORDERED that, to the extent Plaintiffs seek expenses and attorney's fees relative to both motions (ECF Nos. 131, 133), Plaintiffs' request is DENIED.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this 13th day of November 2020.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE