# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

**THADDYEUS AARON DIXON, SR., ET AL.**

**CIVIL ACTION NO.: 18-00133**

**VERSUS**

**JUDGE DAVID C. JOSEPH**

**KEATON A. SPURLIN, ET AL.**

**MAGISTRATE JUDGE JOSEPH H.L. PEREZ-MONTES**

---

## FCA US LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      BACKGROUND ....................................................................................................1

II.     LAW AND ARGUMENT ......................................................................................8

        A.  Summary Judgment Standard ......................................................................8

        B.  Plaintiffs Cannot Sustain Their Burden Under the Louisiana Products Liability Act...............................................................................................8

            1.  Plaintiffs Cannot Prove That the Dixon Vehicle Was Defective in Construction or Composition .................  .........................................................9

            2.  Plaintiffs Cannot Prove That the Dixon Vehicle Was Unreasonably Dangerous in Design.................................................................……...……….11

            3.  Plaintiffs Cannot Prove That the Dixon Vehicle Was Unreasonably Dangerous Due to a Warning Defect.....................................….……...20

            4.  Plaintiffs Cannot Establish That the Dixon Vehicle Failed to Conform to an Express Warranty...........................................…...……………21

III.    CONCLUSION....................................................................................................23

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ashley v. Gen. Motors Corp.*,
27,851 (La. App. 2 Cir. 1/24/96), 666 So. 2d 1320 ............................................................ 10

*Broussard v. Procter & Gamble Co.*,
463 F. Supp. 2d 596 (W.D. La. 2006), *aff'd*, 517 F.3d 767 (5th Cir. 2008) ....................... 21

*Caboni v. General Motors Corp.*,
278 F.3d 448 (5th Cir. 2002) ............................................................................................... 22

*Chaney v. Lucia*,
2013 WL 2147479 (E.D. La. 5/15/13) ................................................................................... 8

*Jaeger v. Automotive Casualty Ins. Co.*,
682 So.2d 292 (La. App. 4th Cir. 1996) ................................................................................. 9

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
910 F.2d 167 (5th Cir.1990) ......................................................................................... 11, 17

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir.1994) ............................................................................................... 11

*Lyles v. Medtronic, Inc.*,
No. CV 15-0910, 2016 WL 1178803 (W.D. La. Mar. 23, 2016) ......................................... 10

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) .......................................................... 8

*Pylant v. Hartford Life and Accident Ins. Co.*,
497 F.3d 536 (5th Cir.2007) .................................................................................................. 8

*Seither v. Winnebago Industries, Inc.*,
853 So.2d 37 (La. App. 4 Cir. 7/2/03) ...................................................................... 11, 12, 20

*Stahl v. Novartis Pharmaceuticals Corp.*,
283 F.3d 254 (5th Cir. 2002) ................................................................................................. 8

*Stults v. Conoco*,
76 F.3d 651 (5th Cir.1996) .................................................................................................... 8

*Thompson v. Nissan N. Am., Inc.*,
429 F. Supp. 2d 759 (E.D. La. 2006), *aff'd*, 230 F. App'x 443 (5th Cir. 2007) .............. 17, 18

*Tubacex, In c. v. M/V Risan*,
45 F.3d 951 (5th Cir.1995) .................................................................................................... 8

*Welch v. Technotrim, Inc.*,
    778 So.2d 728 (La. App. 2nd Cir. 2001) ........................................................................... 10

**Statutes**

Fed. R. Civ. P. 56(a) ........................................................................................................... 8

La. R.S. 9:2800.51, *et seq.* ................................................................................................... 8

La. R.S. 9:2800.53(9) ........................................................................................................ 20

La. R.S. 9:2800.54(a) .......................................................................................................... 9

La. R.S. 9:2800.54(b) .......................................................................................................... 9

La. R.S. 9:2800.54(c) .......................................................................................................... 9

La. R.S. 9:2800.54(d) .......................................................................................................... 9

La. R.S. 9:2800.55 ............................................................................................................. 10

La. R.S. 9:2800.56 ....................................................................................................... 11, 17

La. R.S. 9:2800.57 ............................................................................................................. 20

La. R.S. 9.2800:58 ............................................................................................................. 21

Louisiana Civil Code article 2315.6 ............................................................................ 4, 9, 10

Louisiana Products Liability Act ................................................................................... 3, 4, 8

## FCA US LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

FCA US LLC ("FCA US") respectfully submits this Memorandum in Support of its Motion for Summary Judgment. FCA US prays that the claims asserted against it by Plaintiffs be dismissed, with prejudice, for the following reasons.

### I.   Background

This product liability case arises from a high-speed rear-end impact/roll-over motor vehicle accident caused by a drunk driver. On December 28, 2016, Plaintiffs, Thaddyeus and Alfra Dixon and their four children, traveled in a 2006 Chrysler Town and Country minivan (the "Dixon vehicle" manufactured by FCA US) on Louisiana Highway 3054 in Alexandria, Louisiana.[1] Two of the Dixon's young children, Rayna Dixon and Thaddyeus Dixon, Jr. ("T.J."), rode in child restraints ("child seats") manufactured by co-defendant Dorel Juvenile Group ("DJG") in the vehicle's second row.  Specifically, Rayna (infant, less than 2 months old) occupied a Cosco Light N' Comfy rear-facing child seat located behind the driver, Thaddyeus Dixon, Sr., and T.J. (18 months old) occupied a front-facing Safety 1st Guide 65 child seat located behind his mother, Alfra Dixon, who rode in the vehicle's front passenger seat. The Dixon's two other children, Ava (10 years old) and Farrah (8 years old), sat in the minivan's third row.  The following diagram notes the positions of each occupant, including the post-accident position of Rayna Dixon discussed in more detail, below:

---

[1] R. Doc. 1-2.



At approximately 10:00 pm on the evening of the accident, co-defendant Keaton Spurlin, while operating a 2006 Chevrolet Equinox, rear-ended the Dixon vehicle. Spurlin had a BAC level of .21% and was traveling 84 miles per hour when he struck the Dixons. The impact caused the Dixon vehicle to leave the roadway to the right, return to the road, cross it, leave the opposite side and then complete one revolution before coming to rest on its wheels. After the wreck sequence, Rayna ended up in the third-row seat, still within the carrier portion of her child seat. (The DJG-manufactured Cosco Light N' Comfy child seat in which Rayna rode is made up of two components, a base and a carrier. The base is secured using the vehicle's restraint system to a seating position in the vehicle. The carrier portion attaches to the base, and it can be removed to transport an infant, while the base remains secured to the vehicle. On the night of the incident, Rayna had been removed from the vehicle and returned to it through utilization of the carrier.) During the accident, T.J. suffered a blow to the top of his head that resulted in a skull fracture and

his eventual death.[2] Spurlin later plead guilty to Vehicular Homicide and Vehicular Negligent Injuring. The remaining Plaintiffs reported little or no injury to medical personnel following the accident.

Because everyone in the vehicle except T.J. suffered minor or no injuries, Plaintiffs contend this was a 'walk-away' accident of little significance.  However, the subject accident was **__not__** the 'typical rear-end accident.' Plaintiffs' accident reconstruction expert, Todd Saczalski, calculated the impact resulted in a delta-v of around 24 miles per hour and a peak average force of around 14Gs.[3]  When the speed of the impact and maneuvers[4] of the vehicle are considered, the accident represents an extremely severe and rare accident. In fact, only 0.1% of all reported crashes involve rear-impact crashes with a delta-V in the range of 20-25 miles per hour and a roll-over like the subject accident.[5]

Plaintiffs filed the instant lawsuit against Spurlin, Allstate Insurance Company, DJG, and FCA US on December 21, 2017.[6]  Plaintiffs asserted construction or composition (i.e., manufacturing), design, warning, and warranty defect claims against FCA US.  In other words, Plaintiffs advanced all four theories of liability allowed under the Louisiana Products Liability Act ("LPLA"). Specifically, Plaintiffs alleged that the Dixon vehicle was unreasonably unsafe due to a "heightened risk of rollover" and "heighted likelihood of loss of driver control."[7] Plaintiffs

---

[2] T.J. died the next day, December 29, 2016, never having shown signs of consciousness. As a result, FCA US is filing a separate Motion for Partial Summary Judgment to dismiss Plaintiffs' survival action claim for T.J.

[3] Exhibit A, Expert Report of Todd Saczalski, at p. 38.

[4] The 'maneuvers' in this accident include a rear-end collision to the Dixon vehicle followed by single full rollover of that vehicle.

[5] Over 85% of all rear-impact accidents occur with a delta-V less than 20 mph.  This crash far exceeded those and incorporated a roll sequence. See Exhibit B, Expert Report of Jeya Padmanaban.

[6] See Plaintiffs' Petition for Damages, R. Doc. 1-2.

[7] *Id.* at p. 4.

further alleged that every occupant of the Dixon vehicle, except for Rayna Dixon, suffered injuries as a result of the accident and attributed the cause of these injuries to a defect in the Dixon vehicle.[8]

Plaintiffs amended their Complaint several times to refine their defect claims against FCA US. On October 25, 2018, Plaintiffs filed a Second Amended and Restated Complaint and alleged, for the first time, that the Dixon vehicle was unreasonably unsafe due to "failure of the seat systems" and "heightened risk that the roof would collapse in the event of a roll-over."[9] Almost a year later, on October 3, 2019, Plaintiffs filed a Third Amended and Restated Complaint and changed tact again.[10] This time, Plaintiffs alleged a seat and seatbelt system claim against FCA US, claiming that the Dixon vehicle was unreasonably dangerous and defective due to the "defective design of the minivan's front seats and seatbelt system."[11] Plaintiffs also abandoned their "roof collapse" claim against FCA US.

In addition to their ever-changing defect theories against FCA US, Plaintiffs also have revised their medical causation allegations. While Plaintiffs initially claimed that every occupant in the Dixon vehicle, except for Rayna Dixon, suffered injuries caused by a defect in the Dixon vehicle, Plaintiffs now claim that it was only the negligence of Keaton Spurlin that caused Ava Dixon's and Farah Dixon's injuries.[12] Accordingly, Ava Dixon and Farah Dixon apparently no longer are asserting claims against FCA US under the LPLA, and those claims should be dismissed summarily.[13]

---

[8] *Id.* at p. 3-4.
[9] See Plaintiffs' Second Amended and Restated Complaint, R. Doc. 67, at p. 7-8.
[10] See Plaintiffs' Third Amended and Restated Complaint, R. Doc. 104.
[11] *Id.* at p. 7.
[12] Exhibit C, Plaintiffs' Responses to Interrogatories and Requests for Production of Documents Propounded by FCA US, LLC, Answer to Interrogatory No. 1.
[13] Plaintiffs have asserted claims for bystander damages under Louisiana Civil Code article 2315.6 on behalf of Ava Dion, Farrah Dixon, and Rayna Dixon against FCA US. FCA US has filed a Motion for Partial Summary Judgment to dismiss these claims. See R. Doc. ----.

Plaintiffs have not in discovery waived their allegations that Thaddyeus Dixon, Sr., Alfra Dixon, and T.J. Dixon suffered injuries that were caused by a defect in the Dixon vehicle.[14] However, Plaintiffs have not presented **any** expert evidence or testimony that establishes any defect in the Dixon vehicle caused injuries to Thaddyeus Dixon, Sr. or Alfra Dixon.[15] Thus, the claims of Thaddyeus Dixon, Sr. and Alfra Dixon against FCA US under the LPLA should also be dismissed summarily.

The only remaining claims against FCA US under the LPLA relate to T.J.'s death, with Plaintiffs claiming that his death occurred because the front driver seat 'failed' during the rear-end collision.  Specifically, through their surrogate analysis, Plaintiffs claim that at the initial rear impact, Mr. Dixon's driver's seat collapsed rearward until contacting Rayna's child seat and then twisted clockwise.  Plaintiffs further claim that the action of the driver's seat, combined with the rotation of the vehicle resulting from the initial vehicle-to-vehicle contact during the rear-end portion of the multi-phase accident collision, allowed Mr. Dixon to travel out of his seat, between the two front seats and *diagonally* across the rear of the vehicle where his head struck the front of T.J.'s head, causing T.J.'s fatal skull fracture. To prevent T.J.'s injuries, Plaintiffs' experts advocate an alternative seat design.  Specifically, their experts propose a stiffer seat utilizing what is commonly referred to as an all-belts-to-seat ("ABTS") design.

Notably, just as the Dixons were not involved in a typical rear-end collision, this is not a typical seatback case. Plaintiffs' experts would argue that such a typical case involves a situation when a vehicle is rear-ended, and a front seat deforms and rotates **rearward**, directly contacting and causing injury to a rear occupant seated behind the deflected seat. If this was a 'typical'

---

[14] Exhibit C, Answer to Interrogatory No. 3.
[15] To be clear, FCA US does not suggest to the Court that Mr. and Mrs. Dixon suffered no injuries in the *accident,* but rather that neither the Dixons nor their experts have presented any evidence that the alleged seat/seatbelt system defects that they blame for T.J.'s death also caused Mr. and Mrs. Dixon to suffer injuries.

seatback case, one would expect Plaintiffs to allege that Alfra Dixon's seat (the seat directly in front of T.J.) yielded rearward, allowing her to contact and harm T.J.  However, even Plaintiffs' experts admit that is not what occurred here, as they instead allege that Mr. Dixon moved **diagonally** from the front driver seat into the rear seat where they claim he struck T.J. despite the fact that Mr. Dixon never reported any head injury.  Curiously, all of the demonstrative materials cited by Plaintiffs' experts describe the 'typical' seatback scenario, and none of the Plaintiffs' experts could identify a single case or incident where the dynamics they allege to have been at work here had occurred.[16]

In considering Plaintiffs' claim that the subject seat was defective, it is important to understand the history surrounding this issue.  Simply put, debate over the appropriate strength for automotive seats has been ongoing for decades. Federal Motor Vehicle Safety Standard ("FMVSS") 207 establishes requirements for automotive seats, including seat strength.  Over the years, attempts have been made to increase the seat strength requirement.  Indeed, one of Plaintiffs' experts, Dr. Kenneth Saczalski, petitioned for an increase in the requirement from 3,300 in/lbs. to 56,000 in/lbs. in 1989.  The National Traffic Highway Safety Administration ("NHTSA") opened an investigation into the subject seeking input on whether the strength requirement should be increased to prevent 'yielding' seats.  NHTSA accepted input from automobile manufacturers, research scientists, vehicle consultants, and others.  In 2004 – after 15 years of evaluating input and testing – NHTSA terminated the inquiry after determining that the requested changes to seat strength could not be scientifically shown to reduce injury and could be <u>detrimental</u> to overall safety.

---

[16] Plaintiffs' accident reconstruction expert, Todd Saczalski, testified that he had never before worked on a case involving a rear-impact with an unrestrained child seat followed by a rollover. See Exhibit D, Deposition of Todd Saczalski, at p. 114.

To be sure, stronger seats can increase the risk of occupant injury, as evidenced by this side-by-side comparison of a rear sled test where a Ford Focus's yielding seat is contrasted against a Sebring ABTS design:



For the yielding seat, as the vehicle is rear-ended, the vehicle speeds forward.  Because the occupant is not hard connected to the vehicle, the seatback moves into the occupant's back at a speed approaching the impact speed to the vehicle.  As this occurs, the occupant 'loads' the seatback, and it deforms, allowing the occupant to ride-down the energy of the impact (and as a result, the peak loading experienced by the occupant is reduced).  In the ABTS seat, yielding also occurs—despite Plaintiffs' experts' suggestion otherwise—but the yielding is less than in the non-ABTS seat, and the occupant consequently does not have the same 'ride-down' advantage and instead experiences greater forces applied to his or her body, thus increasing injury risk.

Despite the foregoing, Plaintiffs' experts maintain in this case that the front seats in the Dixon's vehicle should have been ABTS-type seats with a higher strength rating.  For purposes of their case, however, Plaintiffs cannot rest on the aged arguments of their experts.  Rather, they must present admissible evidence for each and every element of their product defect claims as required by the LPLA.  As FCA US will explain in more detail below, the evidence presented by Plaintiffs and their experts in this case is lacking, and Plaintiffs cannot carry their burden of proof and prevail at trial against FCA US under any of the four theories of recovery recognized under

the LPLA. As such, the Court should grant FCA US's Motion for Summary Judgment and dismiss Plaintiffs' claims against FCA US, with prejudice.

## II.     Law and Argument

### A.  Summary Judgment Standard

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). FCA US, as the movant, bears the initial burden of pointing out to the Court the absence of a genuine issue of material fact. *Stults v. Conoco*, 76 F.3d 651 (5th Cir.1996). Once a defendant has made this showing, the plaintiff must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tubacex, In c. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).

"A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir.2007), quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case in order to prevail on a motion for summary judgment. *Chaney v. Lucia*, 2013 WL 2147479, *2 (E.D. La. 5/15/13).

### B.  Plaintiffs Cannot Sustain Their Burden Under the Louisiana Products Liability Act

The Louisiana Products Liability Act provides the exclusive theories of liability for a plaintiff against a manufacturer for damage allegedly caused by its products.  La. R.S. 9:2800.51, *et seq*.; *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254 (5th Cir. 2002). For a manufacturer

to be liable under the LPLA, a plaintiff must establish that his or her damages were "proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. R.S. 9:2800.54(a).

Under the LPLA, a product can be deemed "unreasonably dangerous" in one of four ways: (1) construction or composition (i.e., a 'manufacturing defect'); (2) design; (3) because of lack of an adequate warning; or (4) because of nonconformity to an express warranty. La. R.S. 9:2800.54(b). It is a plaintiff's burden at trial to prove that the product at issue was unreasonably dangerous in one or more of these four manners. La. R.S. 9:2800.54(D). Additionally, the characteristic of the product rendering it unreasonably dangerous must have existed at the time the product left the manufacturer's control. La. R.S. 9:2800.54(c). Additionally, it is well settled that the existence of a defect in a product may not be inferred simply from the fact that an accident occurred or that a user of a product sustained an injury. *Jaeger v. Automotive Casualty Ins. Co.*, 682 So.2d 292, 298 (La. App. 4th Cir. 1996).

Here, Plaintiffs allege that the Dixon vehicle was unreasonably dangerous in all of the four manners provided under the LPLA.[17] Specifically, Plaintiffs claim that the Dixon vehicle was defective in construction or composition, in design, because of lack of adequate warning, and because it failed to conform to an express warranty.[18] However, Plaintiffs lack the requisite proof needed to advance each of these theories.

### 1. Plaintiffs Cannot Prove That the Dixon Vehicle Was Defective in Construction or Composition

Plaintiffs allege that the Dixon vehicle was "unreasonably unsafe in construction or

---

[17] R. Doc. 1-2.
[18] *Id.*

composition."[19]  This is commonly referred to as a 'manufacturing defect' claim.  The LPLA

provides:

> A product is unreasonably dangerous in construction or composition
> if, at the time the product left its manufacturer's control, the product
> deviated in a material way from the manufacturer's specifications or
> performance standards for the product or from otherwise identical
> products manufactured by the same manufacturer.

> La. R.S. 9:2800.55.

In other words, to establish a manufacturing defect claim, a plaintiff "must demonstrate not

only what a manufacturer's specifications or performance standards are for a particular product,

but how the product in question materially deviated from those standards so as to render it

'unreasonably dangerous.'" *Welch v. Technotrim, Inc.*, 778 So.2d 728, 733 (La. App. 2nd Cir.

2001) (emphasis added). When a plaintiff fails to produce evidence of specifications and

performance standards, and deviation therefrom, he fails to prove his case. *See e.g. Ashley v. Gen.*

*Motors Corp.*, 27,851 (La. App. 2 Cir. 1/24/96), 666 So. 2d 1320, 1322 (holding that plaintiffs

failed to prove the accelerator system of their car was unreasonably dangerous due to its

construction or composition where they offered no evidence regarding specifications and

performance standards for the accelerator system or that the system deviated in any fashion from

the identical system installed on similar cars.); *Lyles v. Medtronic, Inc.*, No. CV 15-0910, 2016

WL 1178803, at *6 (W.D. La. Mar. 23, 2016).

Here, Plaintiffs have not identified **any** performance standard applicable to the subject

vehicle from which the seat system or the seatbelt system deviated in a material way. [20]

Furthermore, even if Plaintiffs could identify a performance standard from which the seat system

---

[19] *Id.*

[20] Indeed, Plaintiffs' experts complain that there is no FCA US specification for seat deformation.  While FCA US refutes that position, this demonstrates that Plaintiffs' experts have no claim of a deviation from a standard they allege not even to exist.

10

or seatbelt system deviated in a material way, Plaintiffs have no evidence to prove that this deviation occurred at the time the Dixon vehicle left FCA US's control.[21]

Accordingly, Plaintiffs have done nothing more than make generalized allegations in their Complaint(s) without presenting proof of any deviation from any standard set forth by FCA US, the manufacturer of the Dixon vehicle. Plaintiffs cannot rely on generic, unsupported allegations to establish a construction or composition defect claim. Because Plaintiffs have no evidence to support their burden of proof at trial on the issue of a construction or composition defect, FCA US is entitled to summary judgment on this claim.

### 2. Plaintiffs Cannot Prove That the Dixon Vehicle Was Unreasonably Dangerous in Design

Plaintiffs also allege that the Dixon vehicle was unreasonably unsafe in design. To succeed on a design defect claim, a plaintiff must prove that when the product left the manufacturer's control:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

La. R.S. 9:2800.56.

When claiming that a product is unreasonably dangerous in design, the plaintiff bears the burden of proving "each and every element." *Seither v. Winnebago Industries, Inc.*, 853 So.2d 37, 40 (La. App. 4 Cir. 7/2/03), *citing* La. R.S. 9:2800.54(D). *See also, Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 181 (5th Cir.1990); *criticized on other grounds, Little v. Liquid*

---

[21] It is undisputed that the Dixons purchased the vehicle used. Exhibit E, Deposition of Thaddyeus Dixon, p. 140-148. Further, after their purchase of the vehicle, it was involved in an accident in March or April 2014, declared a total loss, and subsequently titled as a Salvage Reconstructed Motor Vehicle. *Id.*

*Air Corp.,* 37 F.3d 1069, 1075 & n. 14 (5th Cir.1994).  In other words, Plaintiffs must establish that the current design is unreasonably dangerous and caused T.J.'s injuries, that a feasible alternative design existed at the time the Dixon vehicle was designed which would have prevented T.J.'s injuries, <u>and</u> that the risk avoided by the alternative design outweighed the burden of its adoption. *Seither*, 853 So.2d at 40. Plaintiffs have failed to present evidence sufficient to establish this burden of proof.

Plaintiffs have retained three experts to discuss the subject accident and Plaintiffs' design defect claim: Todd Saczalski, Ken Saczalski, and Mark Pozzi. FCA US has filed *Daubert* motions to exclude or limit these experts from testifying at trial.[22] Should the Court grant FCA US's *Daubert* motions, Plaintiffs will be without any expert evidence or testimony to support their design defect claims, and therefore cannot possibly satisfy their burden of proof at trial, entitling FCA US to summary judgment on Plaintiffs' design defect claim.

> a)      ***Plaintiffs Cannot Demonstrate that the Subject Seat Design is Unreasonably Dangerous and Caused T.J.'s Injuries***

Even if Plaintiffs' experts are allowed to testify, however, Plaintiffs cannot sustain their burden of proof for a design defect claim because Plaintiffs have failed to prove that a seat system failure in the subject vehicle caused T.J.'s fatal injuries. In other words, Plaintiffs cannot establish as a threshold matter that the defect they point to – a yielding seat design in the subject vehicle – is 'unreasonably dangerous' in the context of the subject accident.

On this point, it is worth stressing again the uniqueness of Plaintiffs' 'seatback' claim against FCA US. Plaintiffs allege that Mr. Dixon's seat failed and that he moved **<u>diagonally</u>** – at what would be greater than a 50 degree angle – from the front driver seat into the rear seat area, ultimately striking T.J.'s head and causing a skull fracture.  Yet, Plaintiffs have not presented or

---

[22] See R. Doc----.

developed evidence to prove that Mr. Dixon actually struck T.J. as posited.  Kenneth Saczalski, Plaintiffs' biomechanics expert, did not inspect the Dixon vehicle or the Dixon vehicle's seat system or restraints.[23] Plaintiffs offered no sled or crash tests to substantiate this theory, and they offered no calculations or other evidence to demonstrate that sufficient forces acted upon Mr. Dixon to carry him through the front seats and across the second row seating area within the milliseconds of the rear-end impact with enough energy to account for the force necessary to fracture T.J.'s skull. Likewise, Plaintiffs' accident reconstruction expert, Todd Saczalski, performed no such calculation, and he likewise demonstrated no testing to reconstruct the scenario that Plaintiffs claim occurred.[24]

To support their theory, Plaintiffs' experts did nothing more than conduct a surrogate study with an exemplar vehicle to determine if it was *possible* if Mr. Dixon could have contacted T.J.[25] Notably, Dr. Saczalski used his grandson Kurt Saczalski (Todd's son) and asked him to lay back diagonally out of the driver's seat and across the vehicle throughout the second row of the van, as shown in the following photographs:[26]



Naturally, the surrogate demonstration did not involve an impact, and FCA US does not suggest that it should have.  Still,  Plaintiffs' accident reconstruction expert, Todd Saczalski, did not

---

[23] Exhibit F, Deposition of Kenneth Saczalski, at p. 38-39.
[24] Exhibit D, Deposition of Todd Saczalski, at. p. 150.
[25] Exhibit F, Deposition of Kenneth Saczalski at p. 42.
[26] Exhibit G, Expert Report of Kenneth Saczalski, at p. 57.

perform any calculations to support the 'results' of the surrogate study,[27] and he never provided evidence that the angle of travel needed to create the head-to-head contact that Plaintiffs allege developed during the rear-end impact portion of the accident sequence. Indeed, the greatest angle he ever demonstrated was 15 degrees, which no expert in this case has suggested is adequate to cause Mr. Dixon to move at an angle in excess of three times that amount towards T.J.'s seat during the rear-impact phase of this accident. Thus, the surrogate study was not a valid test supported by the evidence and factors of the subject accident and is **not** proof that Mr. Dixon's seat failed and allowed him to cause the injury to T.J. during the accident.

On the other hand, FCA US produced testing data that refuted the suggestion that Mr. Dixon could have moved diagonally rearward as alleged. Among other things, Gregory Stephens, FCA US's accident reconstruction expert, produced testing performed by Volkswagen on a Jetta. The test was performed at a 25 mile per hour Delta-V with a test dummy similar in size to Mr. Dixon and at an angle of 15 degrees – conditions that are notably similar to the conditions suggested by Todd Saczalski as representative of his reconstruction of the Dixon accident.[28] The impact from the testing caused the seat frame to twist inboard, as Plaintiffs claim occurred here as a result of the angled impact, but the test demonstrated that the driver seat occupant did not travel to the area where a second row occupant would have been given T.J.'s position at the time of the accident. Following are photographs of that test produced in this matter:

---

[27] Exhibit D, Deposition of Todd Saczalski, at p. 174.
[28] Exhibit H, Expert Report of Gregory Stephens, at p. 30.



This test serves as clear evidence that Plaintiffs' untested theory is wrong, and this is not a 'factual' dispute as Plaintiffs have no evidence to rebut FCA's evidence on the point.  Thus, Plaintiffs have failed to prove that Mr. Dixon contacted T.J. due to any yielding of Mr. Dixon's seat, and consequently, they have failed to prove a design defect because they cannot show that the seat in place was unreasonably dangerous.

*b)*     ***Plaintiffs Also Cannot Show that their Alternative Design Would have Prevented T.J.'s Injuries***

Even if Plaintiffs could prove that a defective seat design allowed Mr. Dixon to move diagonally rearward, strike T.J., and cause T.J.'s injuries, Plaintiffs *still* must prove that an alternative design would have <u>prevented</u> T.J.'s fatal injuries.

On this issue, Plaintiffs claim that the Dixon vehicle should have been designed with stiffer seats, such as the ABTS seat system used in the Chrysler Sebring convertible. However, Plaintiffs did not perform any testing to support their theory that a stiffer seat system like the Sebring seat would have prevented T.J.'s damages. In fact, Dr. Saczalski testified that even the Sebring seat would have twisted inboard as a result of the severe impact in this accident:

> Q. And Sebring seats are much stiffer on the retractor side than on the non-retractor   side correct?

15

A. Yes.
Q. And so when loaded, they can – can result in some twisting toward the inboard; correct?
A. Correct.
Q. Do you have an opinion, Dr. Saczalski, whether in this impact, had there been a Sebring seat in the driver's position, whether that would have twisted inboard?
A. There -- they -- yes, they would have some twist inboard.[29]

Going further, Plaintiffs allege that the seatbelts in the Dixon vehicle should have been designed with pretensioners that deploy in a rear-impact.[30] However, Dr. Saczalski testified that, even if the Dixon vehicle was equipped with seatbelt pretensioners, Mr. Dixon **still** could have gotten into a position to impact T.J.[31] Thus, their proposed use of pretensioners as part of their alternative design similarly has not been shown to have been capable of preventing T.J.'s fatal injuries.

FCA US contends that the evidence in this case establishes that the Cosco Light N' Comfy child seat, which was detached from its base during the rear-end collision, contacted T.J.'s head during the accident sequence, causing his fatal injuries.[32] However, FCA US does not have the burden of proof in this matter. Instead, Plaintiffs do, and they have failed to produce any evidence that a defect in the Dixon vehicle caused T.J.'s injuries *or* that an alternative design would have prevented T.J.'s fatal injuries.

c)    *Plaintiffs Have Not Performed the Requisite Risk-Utility Test on their Proposed Alternative Design*

Yet, Plaintiffs' failings concerning their design defect claim continue. In addition to presenting an alternative design that would have prevented the injuries and that is feasible and practical, a plaintiff asserting a design claim must show "**also** that the risk avoided by using the

---

[29] Exhibit F, Deposition of Ken Saczalski at p. 122, p. 123
[30] *Id.* at p. 142.
[31] *Id.* at p. 145-146.
[32] Exhibit I, Expert Report of Dr. Elizabeth Raphael, p. 13, 15.

alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility)." *Lavespere,* 910 F.2d at 181. This risk/utility analysis is an <u>independent component</u> of the plaintiff's burden of proof under a design defect claim. La. R.S. 9:2800.56.

In *Thompson v. Nissan N. Am., Inc.*, 429 F. Supp. 2d 759, 762 (E.D. La. 2006), *aff'd*, 230 F. App'x 443 (5th Cir. 2007), the plaintiffs filed a product liability lawsuit after an accident involving a 1993 Nissan Pathfinder. The driver of the Pathfinder lost control of the vehicle, causing it to flip and land on its roof. A large amount of fuel spilled from the vehicle, causing the vehicle to be immediately engulfed in flames. The plaintiffs sued Nissan under the LPLA, claiming that there was a design defect in the Pathfinder's fuel cap which allowed fuel to spill when the vehicle is upside down. The plaintiffs proposed as their alternative design that the fuel filler should have incorporated an anti-spill device, which would have prevented the leakage of fuel in the event the vehicle overturned.

In granting Nissan's Motion for Summary Judgment, the court found that the plaintiffs had failed to carry their burden of proof for a design defect claim under the LPLA, in large part because the plaintiffs have "woefully failed to offer sufficient evidence to survive summary judgment to satisfy this "**'risk-utility' requirement** of the LPLA." *Id.* at 776 (emphasis added). The court remarked that the plaintiffs' experts offered "little, if any, evidence concerning the burden" of switching to their proposed alternative design, as well as no evidence regarding the "costs that the manufacturer would have incurred had it used the alternative design." *Id.* Lastly, and most significantly, the court found that "Plaintiffs have **completely failed to address the adverse effect of their purported safer design**…..on the utility of the Pathfinder," which included the inability to fill the tank at a commercial filling station in a reasonable amount of time, the inability to fill

17

the tank to its full capacity, and fuel spit-back during filling. *Id.* (emphasis added).

Here, just like the plaintiffs in *Thompson*, Plaintiffs have not satisfied their risk-utility requirement regarding the implementation of their proposed alternative design.  Starting first with cost and logistical related issues, Plaintiffs' experts claim, without any support, that there are "no cost reasons" why FCA US did not utilize a stiffer seat system in the Dixon vehicle.[33] This conclusory statement is unsupported and nonsensical.  Plaintiffs' proposed alternative design, the Sebring seat, was designed for use in a *convertible*, not a minivan.  Unlike a traditional sedan and the Dixon vehicle, the Sebring convertible did not have a B-pillar to which to attach the seat belt restraints.[34] Adopting such a design involves a larger seat, extra structural supports in it, and additional structural supports in the vehicle's floor pan, resulting in a heavier and more cumbersome seat design and a redesigned occupant compartment. In simplest terms, one cannot simply drop a Sebring convertible seat into a vehicle that was not configured for such a design from the outset – it would require a complete redesign of the entire vehicle, an extremely costly undertaking to incorporate a seat system that would not have prevented T.J.'s fatal injuries. Yet, Plaintiffs' experts have done nothing to quantify this cost or to assess other negative impacts to the design or performance of the vehicle.

Plaintiffs' failure to address risk-utility related to their alternative design continues, as their experts also have failed to address the most glaring adverse effect of ABTS seats – the safety risk. That is, Plaintiffs have not addressed the risk that an ABTS seat system could have contributed to

---

[33] Exhibit G, Expert Report of Kenneth Saczalski, at p. 150.
[34] The B-pillar is the post between the front and rear doors in a vehicle. Across the vast majority of the vehicle spectrum, seat belt restraint systems are connected to the B-pillar and carried to the vehicle's strongest members as a function of supporting the loads the system is designed to handle during a crash.  For convertibles and some other vehicles that lack a B-pillar, the seat belt restraint system is attached to the seat and then carried through the seat to the vehicle's structure

more injuries in this collision and in other much more common accidents involving lower speed rear-end collisions.

Testing has shown that far from preventing injuries to rear-occupants in extreme outlier accidents like the subject accident,[35] a stronger seat system like the ABTS style seat proposed by Plaintiffs would actually present a higher injury risk to occupants involved in the overwhelming majority of rear-end collisions. More specifically, testing demonstrates that occupants experience high loads or more force to their body during a crash in stiffer or stronger seats. To be sure, injury risk to occupants in the Sebring seat system increased by **168%** in rear-end collisions compared to the seat system present in the Dixon vehicle.[36] This is reflected in the fact that the automotive industry has universally adopted yielding seat designs over the Sebring-type seats for almost all vehicle applications, and only .1% of light vehicles manufactured in the United States have contained seats of the type advanced by Plaintiffs for the last several years.[37] Simply put, these seats are not the panacea Plaintiffs' experts claim them to be, and Plaintiffs have wholesale ignored the potential negative consequences of their use.

In addition to the greater risk posted by ABTS seats in much more common accident scenarios to users in general, those types of seats may very well have increased the injuries sustained by the other occupants in this vehicle, namely Thaddyeus and Alfra Dixon.  It is undisputed that they received very minor injuries despite being involved in a very severe collision. Had they been seated in a stiffer or stronger seat system, such as the Sebring seat system proposed by their experts, Thaddyeus and Alfra Dixon would have been at an *increased* risk of injury and Plaintiffs' experts have done no work to demonstrate a contrary conclusion.

---

[35] The subject accident was extremely rare and constitutes .01% of all reported crashes. Over 85% of all rear-impact accidents occur with a delta-V less than 20 mph.  See footnote 5.
[36] Exhibit J, Expert Report of David Viano at p. 62.
[37] *Id.* at p. 63.

19

In summary, Plaintiffs have not conducted the requisite risk-utility analysis mandated by the LPLA in conjunction with a proposed alternative design.  Their failure to do so is fatal to their claim, as they are unable to demonstrate that the supposed benefits of their alternative design – an ABTS seat system – outweighs the risks and burdens of its adoption, including the increased risk of injury to occupants, in general, and to the Dixons, in particular.

As Plaintiffs cannot establish the elements necessary to carry their burden of proof at trial, FCA US is entitled to summary judgment on Plaintiffs' design defect claim.

### 3.  Plaintiffs Cannot Prove That the Dixon Vehicle Was Unreasonably Dangerous Due to a Warning Defect

Plaintiffs also make the allegation that the Dixon vehicle was unreasonably dangerous due to FCA US's supposed failure to provide adequate warning.[38] The LPLA requires that a manufacturer provide adequate warnings about the product if the product possesses a characteristic that may cause damage.  La. R.S. 9:2800.57.  However, to prevail on an inadequate warning claim, the claimant must not only show a warning provided was inadequate, but he must also propose an adequate warning that, if provided, "would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product in such a manner as to avoid the danger for which the claim was made."  La. R.S. 9:2800.53(9); *Seither*, 853 So.2d at 42 (dismissing plaintiff's warning claims where plaintiff presented no expert testimony concerning warnings or any language of a proposed adequate warning).

Once again, Plaintiffs have absolutely no evidence to support this claim. Plaintiffs have failed to cite any specific warning issued by FCA US that they claim was inadequate. Furthermore, Plaintiffs' vague proposed alternative warning, to "place a child or second row occupant behind

---

[38] R. Doc. 1-2 at p. 4.

an unoccupied seat"[39] is bare-bones and hardly addressed the dangers that Plaintiffs allege lead to T.J.'s death. In fact, Mark Pozzi, Plaintiffs' expert, testified that this proposed alternative warning would **not** have prevented T.J.'s injuries in this case:

> Q. If there was to be a warning then, it's your opinion that warning would be an instruction to not put children behind an occupied seat?
> A. Correct.
> Q. But in this case that wouldn't have made a difference, in your opinion, because of the diagonal nature of Mr. Dixon's motion; right?
> A. Well, because both front seats were occupied. So it would have been -- you know, the only thing that could have possibly been done in this vehicle is to have both seats unoccupied. But how could they do that with the full complement of occupants? **It would have presented an impossible situation.[40]**

As Plaintiffs have failed to produce specific evidence of an inadequate warning issued by FCA US and, further, failed (by their expert's own admission) to produce an alternative warning that would have caused Plaintiffs to avoid the danger that caused T.J.'s fatal injuries, FCA is entitled to summary judgment on Plaintiffs' failure to warn claim.

### 4. Plaintiffs Cannot Establish That the Dixon Vehicle Failed to Conform to an Express Warranty

Finally, Plaintiffs allege that the Dixon vehicle was unreasonably unsafe because it did not conform to an express warranty of FCA US.[41] For Plaintiffs to survive summary judgment on a warranty defect claim, they must establish each and every one of the following elements:  (1) FCA US made an express warranty regarding the Dixon vehicle; (2) that warranty induced Plaintiffs to use the Dixon vehicle; (3) the Dixon vehicle failed to conform to that express warranty; *and* (4) Plaintiffs' damages were caused by the failure of the Dixon vehicle to comply with that express warranty.  La. R.S. 9.2800:58; *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 610

---

[39] Exhibit K, Deposition of Mark Pozzi, p. 58 l. 5-7.
[40] *Id.* at p. 58 l. 16-24 (emphasis added).
[41] R. Doc. 1-2 at p. 4.

(W.D. La. 2006), *aff'd*, 517 F.3d 767 (5th Cir. 2008); *Caboni v. General Motors Corp.*, 278 F.3d 448, 455 (5th Cir. 2002).

As with every other defect theory asserted by Plaintiffs, they again cannot satisfy the necessary elements.  Indeed, Plaintiffs cannot meet even the first essential element as they have not identified with particularity **any** express warranty made at any time by FCA US that was untrue or with which the Dixon vehicle failed to conform. Both Thaddyeus Dixon, Sr. and Alfra Dixon testified that FCA US never made any statements to them regarding the Dixon vehicle that they felt was untrue:

> Q. Has FCA made any statements to you about the vehicle either directly or through any advertisements or anything that you've seen made you believe that you feel are untrue?
> A. No.[42]
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Q. Has FCA or anyone related to Chrysler made any statements to you which you feel are untrue?
> A. No one from Chrysler to me...
> Q. Or FCA?
> A. ...or FCA, no, ma'am, no statements.[43]

Plaintiffs cannot satisfy even the *first* of the four <u>essential</u> elements of their express warranty defect claim because they have failed to identify a single express warranty that they allege is non-conforming. On the contrary, Plaintiffs have admitted that FCA US never made any statements to them about the Dixon vehicle that were untrue. Accordingly, summary judgment is mandated for Plaintiffs' express warranty claim against FCA US.

---

[42] Exhibit L, Deposition of Alfra Dixon, p. 48, l. 19-24.
[43] Exhibit E, Deposition of Thaddyeus Dixon, Sr. at p. 189, l. 15-20.

## III.     Conclusion

Plaintiffs have failed to develop the necessary evidence to support their claims that the Dixon vehicle was defective.  Without proof supporting their claims brought pursuant to the Louisiana Products Liability Act, Plaintiffs cannot succeed against FCA US. Accordingly, FCA US respectfully requests that this Court grant its Motion for Summary Judgment and dismiss all of Plaintiffs' claims against it, with prejudice.

Respectfully submitted,

*/s/:  Quincy T. Crochet*
KEITH W. McDANIEL, T.A. (No. 17992)
QUINCY T. CROCHET (No. 30457)
P. SINNOTT MARTIN (No. 37218)
McCRANIE, SISTRUNK, ANZELMO,
  HARDY, McDANIEL & WELCH, LLC
195 Greenbriar Boulevard, Suite 200
Covington, LA  70433
Telephone:  (504) 831-0946
Facsimile:  (800) 977-8810
kmcdaniel@mcsalaw.com
qcrochet@mcsalaw.com
psm@mcsalaw.com

– and –

AMY B. LARSON, Admitted *Pro Hac Vice*
BISHOP BARTONI, Admitted *Pro Hac Vice*
CHARLES S. SMITH (No. 33650)
BUSH SEYFERTH PLLC
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
Telephone:  (248) 822-7858
Facsimile:  (248) 822-7858
larson@bsplaw.com
bartoni@bsplaw.com
csmith@bsplaw.com

– and –

FRED J. FRESARD, Admitted *Pro Hac Vice*
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Ste. 300

23

Bloomfield Hills, MI 48304
Telephone: (248) 203-0593
Facsimiles: (248) 203-0763
FFresard@dykema.com
IEdwards@dykema.com
SRobb@dykema.com
**Attorneys for FCA US LLC**

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the

Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel by

operation of the Court's electronic filing system this 19th day of March, 2021.

*/s/: Quincy T. Crochet*

24