UNITED STATES DISTRICT COURT
WESTERN DISTRICT LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **THADDYEUS AARON DIXON, SR., *ET. AL.*** | **CIVIL ACTION NO.:1:18-CV-00133** |
| **VERSUS** | **DISTRICT JUDGE DAVID C. JOSEPH** |
| **KEATON A. SPURLIN, *ET AL.*** | **MAGISTRATE JUDGE JOSEPH PEREZ-MONTES** |

### REPLY MEMORANDUM IN FURTHER SUPPORT OF FCA US LLC'S MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

FCA US LLC ("FCA US") respectfully submits this Reply Memorandum in Further Support of its Motion for Summary Judgment (R. Doc. 212). Plaintiffs' Opposition to FCA US's Motion for Summary Judgment (R. Doc. 230) fails to create any genuine issues of material fact. For the following reasons, Plaintiffs still cannot satisfy their burden of proof at trial on any of their claims against FCA US under the Louisiana Products Liability Act ("LPLA"), and the Court should grant FCA US's Motion for Summary Judgment.

**I.     Plaintiffs' Still Have Not Identified a Specific Specification From Which the Seat and Seat Belt System Deviated**

Plaintiffs argue that a genuine issue of fact exists precluding summary judgment on their construction and composition defect claim under the LPLA because the seats in the Dixon vehicle sustained damage after the subject accident. Plaintiffs also argue that the "physical evidence," such as waffling marks, shows that the seatbelt system failed, allowing Mr. Dixon to come out of position and impact TJ.

However, mere evidence of damage is insufficient to maintain a construction and composition claim under the LPLA. The plaintiff "must demonstrate not only what a manufacturer's specifications or performance standards are for a particular product, but how the

product in question materially deviated from those standards so as to render it 'unreasonably dangerous.'" *Welch v. Technotrim, Inc.*, 778 So.2d 728, 733 (La. App. 2nd Cir. 2001) (When a plaintiff fails to produce evidence of specifications and performance standards, and deviation therefrom, he fails to prove his case. *See e.g. Ashley v. Gen. Motors Corp.*, 27,851 (La. App. 2 Cir. 1/24/96), 666 So. 2d 1320, 1322.

Here, Plaintiffs' reliance on FCA corporate deposition testimony as a "performance standard" is completely misplaced. Plaintiffs argue that, since Paul Shea testified that the seats are "allowed to bend but nothing can break or release," and the seats in the Dixon vehicle did break, then the seats deviated from FCA US's performance standard. Plaintiffs have taken Mr. Shea's testimony completely out of context. To be certain, when analyzing its seat design to assure that seats absorb energy and yield in a controlled manner, FCA's engineers review internal testing. Mr. Shea testified regarding FCA US's design and internal testing of their seat system, some of which involves ramping and holding a load on the seat system until "something breaks or gives way."[1] This is **not**, as Plaintiffs insist, a manufacturing specification or a broad statement that all FCA US seats should never break in any accident scenario.

Here, Plaintiffs have *still* failed to point to any specific manufacturing standard from which the seats or seatbelt systems deviated. Additionally, they have failed to show that the subject RS seat was different from other identical RS seats. This is the gist of a manufacturing defect—the thing claimed to be defective has to be mismanufactured, i.e., it failed to meet the manufacturing specifications for it, or it is unlike every other product built to the manufacturing specification. Plaintiffs have no evidence to support their burden of proof at trial on the issue of a construction or composition defect, and FCA US is entitled to summary judgment on this claim.

---

[1] See R. Doc. 217-11 at p. 10.

## II. Plaintiffs' Failure to Test Their Proposed Alternative Design and Properly Formulate a Risk-Utility Analysis is Fatal to Their Design Defect Claim

In their Opposition, Plaintiffs point to testing cited by their expert, Dr. Kenneth Saczalski, as proof that Plaintiffs' have tested an alternative design that would have prevented TJ's fatal injuries, which arose by their experts' hypothesis from the unique scenario where Mr. Dixon's seat failed, allowing him to move **<u>diagonally</u>** – at what would be greater than a 50 degree angle – from the front driver seat into the rear seat area, ultimately striking T.J.'s head and causing a skull fracture.

Plaintiffs' reliance on testing cited by Dr. Saczalski is misplaced as the test results are entirely inapplicable to this case. Dr. Saczalski referenced body-block tests where a load is placed on a seat and the seat is deflected rearward to see if the seat could contact the occupant seated <u>directly behind</u> the seat.[2] Thus, the testing referenced by Plaintiffs is not demonstrative of the subject accident or the mechanism of injury and does not corroborate their claims. Plaintiffs have still failed to produce any testing that a stiffer seat, their proposed alternative design,[3] would have prevented TJ's fatal injures under the conditions presented in the subject accident.

Even more, Plaintiffs have failed to produce any evidence of the risk-utility analysis, which is a separate component of Plaintiffs' burden of proof under La. R.S. 9:2800.56. Instead, Plaintiffs make the extraordinary claim that, essentially, the risk-utility analysis is unnecessary or easily met because the RS seat system in the Dixon vehicle has "*no utility* as to occupant protection."[4] This

---

[2] See R. Doc. 212-9 at p. 33, 61-69.

[3] Plaintiffs' proposed alternative design seems to move like the wind. Indeed, their motion is silent on their alternative's strength parameters, and they have never shown such a seat adapted and placed within the confines of the subject minivan or detailed the costs to have incorporated such a design. Stranger still and supportive of their failure to name an alternative is now the argument that the successor RT seat is their alternative. By their experts' own methodology of testing adequacy of seat strength, a collision with this peak average G load would 'fail' the RT seat with a 220 lb adult. A higher peak average G load, which certainly happens regularly per Plaintiffs' experts, would cause failure at a lower weight.

[4] R. Doc. 230 at p. 17.

argument should be seen for the hyperbole that it is and for the single-minded design focus that Plaintiffs' experts occupy when their sole task is to criticize automobile designers following singular accident patterns. Plaintiffs have trumpeted multiple times that all of the occupants of the Dixon vehicle, except for TJ, "walked away" with minor injuries.[5] The RS seat system was the primary restraint device in this rear-impact/rollover accident, and yet Plaintiffs claim that the RS seat system provided *no utility* when five of the occupants suffered no or minor injuries when they were rear-ended at a closing speed of 84 mph. Still more, this vehicle complies with multiple Federal Motor Vehicle Safety Standards, several of which are tied directly to seat and restraint performance, promulgated for the express purpose of lessening serious injury on the nation's roadways. This argument should be dismissed for the diversionary tactic that it is.

Instead of performing the risk-utility analysis required to sustain a design defect claim under the LPLA, Plaintiffs essentially argue that the jury could decide that "paralysis, brain injury, or death to a second-row occupant (or to a front-seated occupant) outweighs any "utility" provided by the RS's purported protection from minor to moderate injuries."[6] Simply punting this issue to the jury is insufficient – it is Plaintiffs' burden actually to perform the risk-utility analysis, not the jury. To use Plaintiffs' phrase, Plaintiffs have still not presented an "ounce of evidence" about the frequency or risk of their claimed injury pattern in comparison to the potential increase in frequency or magnitude of injury to occupants of stiffer seats involved in the plethora of real world accidents.

Courts grant summary judgment and dismiss design defect claims under the LPLA when a plaintiff fails to produce evidence "concerning the extent of the risk that the alternative design would have avoided, the economic costs entailed by those accidents, or the extent of the reduction

---

[5] See R. Doc. 217-1 at p. 27.
[6] R. Doc. 230 at p. 24.

in frequency of those accident that would have followed on the use of the proposed alternative design." *Hinson v. Techtronic Indus. Outlets, Inc.*, 126 F. Supp. 3d 747, 755 (W.D. La. 2015), *aff'd sub nom. Hinson v. Techtronics Indus. Factory Outlets, Inc.*, 644 F. App'x 371 (5th Cir. 2016). Without **any** scientific analysis to present to the jury to satisfy the risk-utility requirement, Plaintiffs cannot carry their burden of proof at trial on their design defect claim, entitling FCA US to summary judgment.

### III.     Plaintiffs' Proposed Warning Would Not Have Prevented TJ's Fatal Injuries

By their own admission, Plaintiffs have failed to carry their burden of proof for their warning claim under the LPLA. Plaintiffs admit that they cannot cite to any specific warning issued by FCA US that was inadequate.[7] Unable to satisfy this requirement, Plaintiffs instead take the leap that they do not need to formulate a proposed alternative warning. Despite citing *Seither*, Louisiana case law that clearly establishes Plaintiffs' burden to produce a proposed warning, and case law which a federal district court applying Louisiana is bound to apply[8], Plaintiffs claim such is unnecessary and simply divine that the Louisiana Supreme Court would find such a burden not required. Plaintiffs conveniently overlook that the Louisiana Supreme Court **twice** denied cert in the *Seither* case. *See Seither v. Winnebago Indus.*, Inc., 2002-2091 (La. App. 4 Cir. 7/2/03), 853 So. 2d 37, ***writ denied***, 2003-2797 (La. 2/13/04), 867 So. 2d 704, and ***writ denied***, 2003-2799 (La. 2/13/04), 867 So. 2d 705.

Further undercutting their argument, Plaintiffs did produce a proposed warning. Plaintiffs' expert, Mark Pozzi, testified that a proposed warning would need to direct the consumer to place

---

[7] *Id.* at p. 19.
[8] *See Enola Taylor v. Jim Walter Corp.*, 731 F.2d 266, 267 (5th Cir.1984) ("The decisions of the state intermediate appellate courts are binding, absent a "strong showing" that the Louisiana Supreme Court would hold to the contrary."); *See Also First Acadiana Bank v. Sandoz*, 72 B.R. 100, 103 (W.D. La. 1987) ("This Court does not challenge the ability of the Louisiana Court of Appeals to make state law, nor question the substantive merit of its decisions.").

their children behind **unoccupied seats**.[9]  However, this proposed alternative warning would **not** have prevented TJ's fatal injuries in this case, as it is undisputed that the driver seat and passenger seat were occupied at the time of the accident.[10] Thus, Plaintiffs' proposed warning would have been completely useless and would not have prevented TJ's fatal injuries. As Plaintiffs have failed to produce specific evidence of an inadequate warning issued by FCA US and, further, failed (by their expert's own admission)[11] to produce an alternative warning that would have caused Plaintiffs to avoid the danger that caused TJ's fatal injuries, FCA US is entitled to summary judgment on Plaintiffs' failure to warn claim.

### IV. Plaintiffs Have *Still* Failed to Identify an Express Warranty to Which the Dixon Vehicle Failed to Conform

Lastly, Plaintiffs still have not supported their violation of an express warranty claim.  The Court will recall that Plaintiffs purchased the subject vehicle used when its mileage was 41,410. Even in opposition to FCA US's motion, Plaintiffs have failed to point to an express warranty that was made to them, induced them to use the vehicle, and that they have shown was untrue.[12]  In their Opposition, Plaintiffs attempt to substantiate their express warranty claim by pointing to a section of the Owner's Manual that references that the front airbag control module triggers the pretensioners. Plaintiffs then claim that somehow this statement is evidence of breach of an express warranty because the "pretensions are completely useless and ineffective in a rear-end collision." Plaintiffs are again resorting to diversionary tactics to fill holes in their case.  The complete excerpt from the Owner's Manual reads:

---

[9] *Id.* at p. 22.
[10] See R. Doc. 212-1 at p. 5 for a diagram depicting the positioning of the occupants in the Dixon vehicle at the time of the accident.
[11] R. Doc. 212-13 at p. 58.
[12] Plaintiffs' show advertising materials produced by FCA in response to discovery.  They have provided no evidence of any FCA advertising materials reviewed by them that induced them to use the subject vehicle.

> **Seat Belt Pretensioners**
> The seat belts for both front seating positions are equipped with pretensioning devices that are designed to remove slack from the seat belt in the event of a collision. These devices improve the performance of the seat belt by assuring that the belt is tight about the occupant early in a collision. Pretensioners are designed to work for all size occupants.
>
> **NOTE:** These devices are not a substitute for proper seat belt placement by the occupant. The seat belt still must be worn snugly and positioned properly.
>
> The pretensioners are triggered by the front airbag control module (see Front Airbag Section)[13]. Like the front airbags, the pretensioners are single use items. After a collision that is *severe enough to deploy the front airbags* and pretensioners, both must be replaced.[14]

The Owner's Manual makes clear that the statements regarding seat belt pretensioners apply in frontal collisions, **not** rear-end collisions. Indeed, Plaintiffs cannot point to any statements made by FCA US that guarantees pretentioners will deploy in rear-end collision. Moreover, Plaintiffs have not shown the statement is untrue. Here, there was no deployment of the front airbags. Plaintiffs' burden is to prove a violation of an *express* warranty. Plaintiffs cannot carry this burden, and FCA US is entitled to summary judgment on Plaintiffs' express warranty claim.

## V.   Conclusion

For the above reasons, and the reasons stated in FCA US's Memorandum in Support (R. Doc. 212), FCA US respectfully requests that the Court grant its Motion for Summary Judgment and dismiss all of Plaintiffs' claims against FCA US with prejudice.

                         Respectfully submitted,

                         */s/:  Keith W. McDaniel*
                         KEITH W. McDANIEL, T.A. (No. 17992)
                         QUINCY T. CROCHET (No. 30457)
                         P. SINNOTT MARTIN (No. 37218)
                         McCRANIE, SISTRUNK, ANZELMO,
                          HARDY, McDANIEL & WELCH, LLC

---

[13] The "Front Airbag Section" states that, "The front airbags deploy in moderate to severe *frontal collisions*."
[14] R. Doc. 230-5 at p. 4 (emphasis original).

        195 Greenbriar Boulevard, Suite 200
Covington, LA 70433
Telephone: (504) 831-0946
Facsimile: (800) 977-8810
kmcdaniel@mcsalaw.com
qcrochet@mcsalaw.com
psm@mcsalaw.com

– and –

AMY B. LARSON, Admitted *Pro Hac Vice*
BISHOP BARTONI, Admitted *Pro Hac Vice*
CHARLES S. SMITH (No. 33650)
BUSH SEYFERTH PLLC
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
Telephone: (248) 822-7858
Facsimile: (248) 822-7858
larson@bsplaw.com
bartoni@bsplaw.com
csmith@bsplaw.com

– and –

FRED J. FRESARD, Admitted *Pro Hac Vice*
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Ste. 300
Bloomfield Hills, MI 48304
Telephone: (248) 203-0593
Facsimiles: (248) 203-0763
FFresard@dykema.com
IEdwards@dykema.com
SRobb@dykema.com
***Attorneys for FCA US LLC***

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel by operation of the Court's electronic filing system this 14th day of April, 2021.

                              */s/: Keith W. McDaniel*